CLARA MORGAN SHACKIL, ALBERT SHACKIL, AND DEANNA MARRERO, P/P/A HER MOTHER AND NEXT FRIEND, CLARA MORGAN SHACKIL, PLAINTIFFS–RESPONDENTS, v. LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID CO.; AND PARKE–DAVIS, A DIVISION OF WARNER–LAMBERT CO., AND ELI LILLY AND COMPANY, DEFENDANTS–APPELLANTS, AND WYETH LABORATORIES, A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; WYETH LABORATORIES, INC.; PITTMAN–MOORE AND ITS SUCCESSOR, THE DOW CHEMICAL COMPANY AND LEO FELD, M.D., DEFENDANTS.

Argued September 13, 1988—Decided July 31, 1989.

*J. Peter Coll, Jr.*, a member of the New York bar, argued the cause for appellants Lederle Laboratories (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski*, attorneys, *J. Peter Coll, Jr.* and *James L. Melhuish*, of counsel, *James L. Melhuish* and *William J. Ruane*, on the briefs).

*Myron J. Bromberg*, argued the cause for appellant Parke–Davis (*Porzio, Bromberg & Newman*, attorneys, *Anita Hotchkiss*, of counsel, *Moira L. Brophy* and *Lauren E. Handler*, on the briefs).

*John L. McGoldrick*, argued the cause for appellant Eli Lilly and Company (*McCarter & English*, attorneys, *John L. McGoldrick, Marie S. Woodbury*, a member of the Kansas and the Missouri Bars and *Harvey L. Kaplan*, a member of the Missouri Bar, of counsel; *John L. McGoldrick, Marie S. Woodbury, Harvey L. Kaplan, John F. Brenner, Keith E. Lynott*, and *Jerry P. Sattin*, on the briefs).

*Jan R. Schlichtmann*, a member of the Massachusetts bar, argued the cause for respondents (*Blume, Vazquez, Goldfaden, Berkowitz & Oliveras*, attorneys, *John M. Blume* and *Michael R. Hugo*, a member of the Massachusetts bar, of counsel).

*Thomas F. Campion* submitted a brief on behalf of *amici curiae* Merck & Co., Inc., Abbott Laboratories, and The Upjohn Company (*Shanley & Fisher*, attorneys for Merck & Co., Inc., *Tompkins, McGuire & Wachenfeld*, attorneys for Abbott Laboratories, and *Lamb, Hartung, Coughlin, Kretzer & Reinman*, attorneys for The Upjohn Company, *Thomas F. Campion, Joan S. Antokol*, and *Larry M. Pollack*, on the briefs).

*John B. Kearney* and *John Philip Kirchner* submitted a brief on behalf of *amicus curiae* American Academy of Pediatrics (*Kenney & Kearney*, attorneys).

*Arthur Ian Miltz* submitted a brief on behalf of *amicus curiae* Association of Trial Lawyers of America, New Jersey Branch (*Miltz & Mantel*, attorneys, *Arthur Ian Miltz* and *Marc E. Lesser*, on the brief).

*Charles J. Walsh* submitted a brief on behalf of *amici curiae* E.R. Squibb & Sons, Inc., McNeilab, Inc., Ortho Pharmaceutical Corporation, and Janssen Pharmaceutica, Inc. (*Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross,* attorneys, *Charles T. Walsh, Stuart M. Feinblatt,* and *Kathleen Burns,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This is a medical-malpractice and products-liability action arising out of the 1972 inoculation of the infant plaintiff with a combined diphtheria-pertussis-tetanus vaccine, commonly known as DPT vaccine. Despite extensive discovery, plaintiffs were unable to identify the manufacturer of the DPT vaccine administered to the infant plaintiff. The issue is whether, in the context of childhood vaccinations, New Jersey should substitute for the element of causation-in-fact a theory of "market share" liability, thereby shifting to defendant manufacturers the burden of proof on the issue of causation.

We conclude that the imposition of a theory of collective liability in this case would frustrate overarching public-policy and public-health considerations by threatening the continued availability of needed drugs and impairing the prospects of the development of safer vaccines. Moreover, we are satisfied that an alternative compensation scheme established by Congress, entitled the National Childhood Vaccine Injury Act of 1986, 42 *U.S.C.A.* §§ 300aa–1 to –34 (West Supp.1988), will fulfill in large measure the goal of providing compensatory relief to vaccine-injured plaintiffs.

We therefore reverse the judgment of the Appellate Division and reinstate summary judgment in favor of defendant manufacturers.

I

Underlying this appeal is a profound human tragedy. On October 24, 1972, two days before her second birthday, plaintiff

Deanna Marrero was given a final "booster" shot of a DPT vaccine by Dr. Feld, defendant pediatrician. Plaintiff Clara Morgan Shackil, the child's mother, noticed that within twenty-four hours of the inoculation Deanna displayed symptoms of extreme pain. The rapid deterioration of her condition resulted in the loss of her then-acquired verbal, motor, and mental capacities. Deanna, now eighteen years of age, has been diagnosed as having chronic encephalopathy and severe retardation. She is institutionalized and requires constant care.

In April 1985, thirteen years after the inoculation that allegedly caused plaintiff's condition, Deanna Marrero and her parents brought suit against Dr. Feld and Lederle Laboratories, one of the manufacturers of DPT during 1971–72. The complaint asserted theories of negligence, breach of warranty, misrepresentation, and strict liability based on design defect. Plaintiffs' delay in filing suit was occasioned by the fact that it was not until 1984 that Mrs. Shackil became aware of the linkage between brain damage and the pertussis portion of the DPT vaccine.

Largely because of the extensive time that had elapsed between the inoculation and the lawsuit, plaintiffs were unable to establish that Lederle Laboratories in fact manufactured the vaccine that caused Deanna's injuries. The pediatrician, Dr. Feld, retained no records that would have revealed the brand name of the vaccine administered, and his pharmacist is no longer alive. In his deposition, Dr. Feld testified that he had used Lederle's vaccine "for the most part"; however, he also indicated that on occasion he had used DPT vaccines manufactured by Eli Lilly, Wyeth Laboratories, Parke–Davis, and Pitman–Moore. Dr. Feld did not mention the name of National Drug Company, the only remaining manufacturer of DPT at the time of Deanna's inoculation.

Plaintiffs amended their complaint to include the additional manufacturers referred to in Dr. Feld's deposition but not National Drug Company. After several months of discovery,

however, plaintiffs were still unable to identify the manufacturer of the vaccine administered to Deanna. Consequently, defendants Lederle, Eli Lilly, Wyeth, and Parke–Davis moved for summary judgment based on plaintiffs' failure to satisfy an essential element of a *prima facie* case—the identity of the manufacturer and distributor of the DPT dosage.

Relying on *Namm v. Charles E. Frosst & Co.*, 178 *N.J.Super.* 19 (App.Div.1981), the trial court granted defendant manufacturers' motions for summary judgment and entered orders dismissing the complaints as to those defendants. The Appellate Division granted leave to appeal and reversed. *Shackil v. Lederle Laboratories*, 219 *N.J.Super.* 601 (1987).

In the Appellate Division the case produced three opinions, two leading to a reversal and remand, and one to an affirmance. The lead opinion explained that although the trial court was correct in relying on *Namm* to dismiss the complaint, the Appellate Division's role was "to determine what the Supreme Court would do if faced with the problem before us." 219 *N.J.Super.* at 621. The lead opinion held that the rejection of collective liability theories, "which have been developed in states with views of tort law similar to our own[,] would be an unwarranted deviation from what we believe to be a course already charted by our Supreme Court." *Ibid.*

The lead opinion examined and summarized the current theories of concert of action, alternative liability, enterprise liability, and market-share liability, *id.* at 622–30, as do we, *infra* at 162–164. According to the lead opinion a "risk-modified market share" approach was most aptly suited to the circumstances of this case. Under that approach

[a] plaintiff should first demonstrate that the specific manufacturer of a defective product proven to have caused the injury cannot be identified, and join the manufacturers of a substantial share of the relevant market, defined as all who could have distributed the product to the plaintiff. Once this has been accomplished, the burden is placed on the defendants to exculpate themselves by proving either non-participation, possession of a reduced market share or that their product engendered a lower risk. Our aim should be to determine the percentage of the potential risk to the plaintiff caused by each manufacturer of

the product, and in this respect our resolution of this issue departs somewhat from a pure market share analysis. [*Id.* at 630–31.]

Under the lead opinion, on remand the trial court was to impose risk-modified market-share liability as a substitute for the causation-in-fact requirement "only if the standards to which plaintiffs seek to hold defendants have not been preempted by federal regulation, and if plaintiffs otherwise demonstrate that the product, with its recognized utility, was indeed defective, given the existing technology when it was manufactured and distributed." *Id.* at 634 (citing *Feldman v. Lederle Laboratories,* 97 *N.J.* 429, 452 (1984)).

A second opinion, concurring in the judgment of remand and not foreclosing the availability of market-share liability, agreed that reliance on *Namm, supra,* 178 *N.J.Super.* 19, would be misplaced, and that a remand would appropriately "permit development of an adequate record from which the Supreme Court can review the matter in the context of specific factfinding." 219 *N.J.Super.* at 640–41. The concurring member added that the remand should determine as well whether the recently-enacted products-liability legislation, *N.J.S.A.* 2A:58C–1 to –7, applied to the case, and if not, whether any policies embodied in the new legislation were nonetheless relevant to the analysis.

The dissenting member of the Appellate Division panel reasoned that in the absence of "amendatory legislation," an intermediate appellate court should not depart from "traditional concepts and basic principles," 219 *N.J.Super.* at 642, but should leave such a decision to a court of last resort. Moreover, the dissenter below concluded that the collective-liability theory adopted by the lead opinion was not administratively sound and would "add to the cost of the end product and discourage the production of needed drugs and commodities." *Id.* at 643. Finally, any decision supporting collective liability in this case was inappropriate in light of the legislature's recent enactment of a products-liability statute, and placed the legisla-

ture in "the position of having to react to what may well be unwarranted judicial fiat." *Id.* at 643.

We granted leave to appeal, 109 *N.J.* 519, 520 (1987), and have permitted the participation of various *amici.* Our primary focus is on whether plaintiffs have demonstrated that a theory of market-share liability should be applied to the facts of this case to allow plaintiffs' claims against defendant manufacturers to proceed. Because this appeal emanates from a motion for summary judgment, we must construe the pleadings and papers in the light most favorable to the nonmoving party, in this case the plaintiffs. *E.g., Ruvolo v. American Casualty Co.,* 39 *N.J.* 490, 499 (1963); *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 75 (1954). Therefore, we will assume that the vaccines manufactured by defendants were defectively designed and that Deanna's injuries were directly caused by a DPT inoculation and not from a hereditary immunological or neurological disorder, issues that would potentially surface at later stages of this litigation. *See, e.g., Niemiera v. Schneider,* 114 *N.J.* 550, 554 (1989) (noting possibility of independent cause of plaintiffs' injuries, unrelated to DPT inoculation); *Feldman v. Lederle Laboratories, supra,* 97 *N.J.* at 429 (whether a prescription drug is "unavoidably unsafe," and therefore subject to § 402A of the Restatement (Second) of Torts comment k protection, is to be determined on a case-by-case basis).

## II

At the center of this appeal is the traditional element of causation-in-fact, "that reasonable connection between the act or omission of the defendant and the damages which plaintiff has suffered." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser & Keeton on the Law of Torts* § 41 at 263 (5th ed. 1984) [hereinafter *Prosser & Keeton* ]. The purpose of the causation-in-fact requirement, besides assigning blameworthiness to culpable parties, is to limit the scope of potential

liability and thereby encourage useful activity that would otherwise be deterred if there were excessive exposure to liability. Fischer, "Products Liability—An Analysis of Market Share Liability," 34 *Vand.L.Rev.* 1623, 1628–29 (1981) (citing W. Prosser, *Handbook of the Law of Torts* 237, 239 (4th ed. 1971)). Although proof of causation-in-fact is ordinarily an indispensable ingredient of a *prima facie* case, exceptions have nevertheless arisen that have allowed plaintiffs to shift to defendant or a group of defendants the burden of proof on the causation issue. Those exceptions include "concert of action," with its offspring, "enterprise liability"; alternative liability; and market-share liability. In fact, the theory that we are urged to adopt in this case, modified market-share liability, is essentially an extension of the alternative-liability theory. The concert-of-action exception nevertheless warrants brief comment.

The theory of "concert of action" derives from the criminal concept of aiding and abetting. *Ryan v. Eli Lilly & Co.*, 514 *F.Supp.* 1004, 1015 (D.S.C.1981). It allocates responsibility among parties who "in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or * * * lend aid or encouragement to the wrongdoers, or ratify and adopt the wrongdoer's acts done for their benefit * * *." *Prosser & Keeton, supra*, § 46 at 323. The clearest example of "concerted action" liability is the drag race in which two drivers agree to race and one collides with and injures a third party. Both drivers are jointly and severally liable for the injury to the third party even though only one driver inflicted the harm. *Restatement (Second) of Torts* § 876 at 315 (1982). Some courts have applied the theory of "concert of action" in the context of DES, a synthetic drug that was prescribed for pregnant women to prevent miscarriage and was later proven to be linked to cellular abnormalities. *See, e.g., Abel v. Eli Lilly & Co.*, 418 *Mich.* 311, 336–39, 343 *N.W.*2d 164, 176 (holding all DES manufacturers jointly and severally liable if unable to exculpate themselves), *cert.* den. *sub nom. E.R. Squibb & Sons v. Abel*,

469 *U.S.* 833, 105 *S.Ct.* 123, 83 *L.Ed.*2d 65 (1984); *Bichler v. Eli Lilly & Co.*, 55 *N.Y.*2d 571, 450 *N.Y.S.*2d 776, 436 *N.E.*2d 182 (1982) (because DES manufacturer made no motion to dismiss the complaint for failure to state a cause of action, "concerted action" theory became controlling law of case), *overruled, Hymowitz v. Eli Lilly & Co.*, 73 *N.Y.*2d 487, 541 *N.Y.S.*2d 941, 945, 539 *N.E.*2d 1069, 1073 (N.Y.1989). *But see Ryan v. Eli Lilly & Co., supra*, 514 *F.Supp.* 1004 (rejecting application of concert-of-action theory of liability against DES manufacturers). Moreover, an extension of this theory, called "enterprise liability," was developed in the context of the blasting-cap industry in *Hall v. E.I. du Pont de Nemours & Co.*, 345 *F.Supp.* 353 (E.D.N.Y.1972). As explained in the lead opinion below, "[t]he enterprise or industry-wide liability theory imposes liability on all members of an industry [that] has produced a product causing a particular harm. The defendants then have the opportunity to exculpate themselves." 219 *N.J.Super.* at 624. In *Hall* the court allowed a relaxation of the traditional burden of proving causation because defendants, six blasting-cap manufacturers and their industry trade association "exercise[d] actual collective control over a particular risk-creating product * * *." 345 *F.Supp.* at 376.

Without embarking on an analysis of the merits in or the inherent problems of applying concert-of-action theory to prescription drugs, we are persuaded that the theory is not applicable to this case. There are no allegations that the manufacturers of DPT had a "tacit understanding" or "common plan" to produce a defective product or not to conduct adequate tests on the vaccine. Indeed, unlike the producers of DES, for example, each of the manufacturers involved in this case made the DPT vaccine by a different process, protected by patent or trade secret. Each process was separately licensed by the Food and Drug Administration (FDA) under established guidelines for the production of the vaccine. 21 *C.F.R.* § 620.1 to 620.6 (1988); *see, e.g., Jones by Jones v. Lederle Laboratories*, 695 *F.Supp.* 700, 703–04 (E.D.N.Y.1988). In addition, each lot of

the DPT vaccine was separately tested by the office of Biologics Research and Reviews, a division of the FDA. 21 *C.F.R.* 620.6 (1988). Application of "concert of action" to this case "would [therefore] expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant." *Sindell v. Abbott Laboratories,* 26 *Cal.*3d 588, 605, 163 *Cal.Rptr.* 132, 141, 607 *P.*2d 924, 933 *cert.* den., 449 *U.S.* 912, 101 *S.Ct.* 286, 66 *L.Ed.*2d 140 (1980); *accord Hymowitz v. Eli Lilly & Co., supra,* 73 *N.Y.*2d 487, 541 *N.Y.S.*2d at 945, 539 *N.E.*2d at 1073; *Martin v. Abbott Laboratories,* 102 *Wash.*2d 581, 598, 689 *P.*2d 368, 379 (1984).

A second exception to the causation-in-fact requirement, termed "alternative liability," was developed by the California Supreme Court in *Summers v. Tice,* 33 *Cal.*2d 80, 199 *P.*2d 1 (1948). The opinion in that case is essentially the starting point for any analysis of market-share liability. In *Summers,* two hunters fired their guns in the direction of plaintiff, whose eye was severely injured as a result of one of the gunshots. At trial, plaintiff established that both defendants were negligent; however, plaintiff was unable to identify which shot hit him. The trial court nevertheless concluded that the negligence of both defendants was the legal cause of the injury and that therefore both were responsible for the result. On appeal, the Supreme Court of California upheld the trial court's relaxation of the causation-in-fact requirement, reasoning that because both defendants were negligent in respect of the plaintiff, it would be unjust to require the victim to isolate the guilty defendant. *Id.* at 88, 199 *P.*2d at 3. Consequently, the burden was shifted to each defendant to exculpate himself, on the failure of which he would incur liability for the entire damages. *See, e.g., Restatement (Second) of Torts* § 433B(3) (1965) (codifying theory in *Summers* ).

"Alternative liability" is not applicable where not all of the culpable defendants have been joined in the action. *See Sindell v. Abbott Laboratories, supra,* 26 *Cal.*3d at 602, 163 *Cal.Rptr.* at 139, 607 *P.*2d at 931. That impediment to "alternative liability" has not deterred courts from fashioning a separate theory, denominated "market share liability," which embodies the concept of "alternative liability" while eliminating the necessity of joining all possible tortfeasors and the requirement of contemporaneous negligent acts. The seminal market-share case is *Sindell v. Abbott Laboratories, supra,* 26 *Cal.*3d 588, 163 *Cal.Rptr.* 132, 607 *P.*2d 924, a class-action suit based on design defect, brought against the manufacturers of the drug DES for injuries sustained *in utero.* Because of the latent nature of the injury and the .fact that the drug was produced by approximately two hundred manufacturers from a generic formula that was prescribed interchangeably, plaintiffs were unable to identify the manufacturer who actually produced the injury-causing product. The California Supreme Court held that the inability to identify a defendant was not fatal to plaintiff's cause of action, provided plaintiff join as defendants a "substantial share" of manufacturers who produced or supplied "the DES which her mother might have taken." *Id.* at 612, 163 *Cal.Rptr.* 145, 607 *P.*2d at 937. The burden would then shift to the defendant manufacturers to demonstrate that they could not have produced the DES ingested by plaintiff's mother. Any manufacturer that could not exculpate itself would be held liable "for the proportion of the judgment represented by its share of the market" of DES. *Ibid.*

Two important policy considerations supported the *Sindell* court's decision to apply market-share liability. The first, "most persuasive" consideration was the one addressed in *Summers:*

> [A]s between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury. Here, as in *Summers,* plaintiff is not at fault in failing to provide evidence of causation, and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role

in creating the unavailability of proof. [Id. at 610–11, 163 *Cal.Rptr.* at 144, 607 *P.*2d at 936.]

The second consideration was that a DES manufacturer was in a better position to insure against the risk of injury; "thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety." *Id.* at 611, 163 *Cal.Rptr.* at 144, 607 *P.*2d at 936.

The market-share theory announced in *Sindell* was subsequently adopted, with modifications, by three states' highest courts. *See Hymowitz v. Eli Lilly & Co., supra,* 73 *N.Y.*2d 487, 541 *N.Y.S.*2d 941, 539 *N.E.*2d 1069 (N.Y.1989) (adopting market-share theory of liability in which DES defendants are liable in proportion to their share in national market irrespective of proof that they did not cause the injury); *Martin v. Abbott Laboratories, supra,* 102 *Wash.*2d 581, 689 *P.*2d 368 (adopting "modified market share" liability, in which plaintiff must join only one defendant who produced or marketed injury-causing product; burden is then shifted to defendant to prove its percentage share of market and thereby lower presumptive equal share of market); *Collins v. Eli Lilly & Co.,* 116 *Wis.*2d 166, 342 *N.W.*2d 37 (adopting modified market-share theory of liability in which each DES defendant is liable in proportion to its "respective contribution" to the result, as measured by various factors), *cert.* den., 469 *U.S.* 826, 105 *S.Ct.* 107, 83 *L.Ed.*2d 51 (1984); *see also Smith v. Eli Lilly & Co.,* 173 *Ill.App.*3d 1, 122 *Ill.Dec.* 835, 527 *N.E.*2d 333 (1988) (adopting theory of liability enunciated in *Martin, supra,* in context of DES).. *But see Mulcahy v. Eli Lilly & Co.,* 386 *N.W.*2d 67, 76 (Iowa 1986) (rejecting market share theory in DES context on policy grounds and categorizing approach as more appropriately within the legislative domain); *Zafft v. Eli Lilly & Co.,* 676 *S.W.*2d 241, 247 (Mo.1984) (rejecting market-share-liability approach in DES context on grounds that the theory would discourage desired pharmaceutical research and development and would provide little incentive to produce safer products). In addition, two federal courts have made the "bold foray[ ] into

*terra incognita," Tidler v. Eli Lilly & Co.,* 851 *F.*2d 418
(D.C.Cir.1988), and allowed DES diversity claims to proceed
under the market-share theory. See *McCormack v. Abbott
Laboratories,* 617 *F.Supp.* 1521 (D.Mass.1985) (allowing DES
claim to proceed under Massachusetts law); *McElhaney v. Eli
Lilly & Co.,* 564 *F.Supp.* 265, 269–71 (D.S.D.1983) (holding that
because under South Dakota law plaintiff is not required to
identify which of defendant-DES manufacturers produced inju-
ry-causing product, burden on causation issue is shifted to
defendants). *But see Tidler v. Eli Lilly & Co., supra,* 851 *F.*2d
418 (refusing to apply market-share liability to DES manufac-
turers under the laws of Maryland and District of Columbia
because neither state recognizes "non-identification" theories);
*Mizell v. Eli Lilly & Co.,* 526 *F.Supp.* 589 (D.S.C.1981) (holding
that the application of *Sindell* market-share liability against
DES manufacturers would violate public policy of South Car-
olina).

Despite its limited acceptance, the *Sindell* decision left sever-
al issues unanswered. *See, e.g., Sindell, supra,* 26 *Cal.*3d at
615, 163 *Cal.Rptr.* at 147, 607 *P.*2d at 939 (Richardson, J.,
dissenting) (noting absence of any guidance regarding "sub-
stantial share" of the relevant market). Among them was the
question of whether market-share liability was intended to
apply to claims other than DES. That issue has frequently
arisen in the context of asbestos litigation, where in most cases
market-share liability is held inapplicable for public-policy rea-
sons, *see, e.g., Thompson v. Johns–Manville Corp.,* 714 *F.*2d
581 (5th Cir.1983) (refusing to apply "market share" liability in
diversity case because it represents "radical departure[ ] from
traditional theories of tort liability," *id.* at 583), and because

products containing asbestos are not uniformly harmful—many products con-
tain different degrees of asbestos. Thus "the total risk created by any
manufacturer would be a function of both its share of the market and the
relative harmfulness of its products"; but a company's market share could not
be adjusted for the latter relation. [*Starling v. Seaboard Coast Line R.R. Co.,*
533 *F.Supp.* 183, 191 (S.D.Ga.1982) (citation omitted).].

*See also Mullen v. Armstrong World Indus. Inc.,* 200 *Cal. App.*3d 250, 246 *Cal.Rptr.* 32 (Ct.App.1988) (rejecting the application of "market share" liability against the manufacturers of asbestos products because of diverse nature of products); *Goldman v. Johns–Manville Sales Corp.,* 33 Ohio St.3d 40, 514 *N.E.*2d 691 (1987) (refusing to apply *Sindell* to asbestos products on grounds that there was a difference between risks associated with asbestos and that it would be inherently unfair to hold companies accountable for market share); *cf. Blackston v. Shook & Fletcher Insulation Co.,* 764 *F.*2d 1480 (11th Cir.1985) (holding that "significant policy reasons" favor retention of proximate cause as an essential element of cause of action in asbestos litigation).

At present, there are three reported cases addressing the question of whether to apply a theory of market-share liability to a vaccine case. Of these three only one involves the theory urged in this case, that is, that the vaccine is defectively designed. Thus, in *Senn v. Merrell–Dow Pharmaceuticals, Inc.,* 305 *Or.* 256, 751 *P.*2d 215 (1988), the Oregon Supreme Court rejected a theory of market-share liability against two DPT manufacturers in the context of a design-defect claim on grounds that the "adoption of any theory of alternative liability requires a profound change in fundamental tort principles," which was perceived as more properly in the domain of the legislature. *Id.* at 271, 751 *P.*2d 223.

The other two cases involve the imposition of market-share liability in respect of a vaccine based on a manufacturing defect, a theory not relied on in this case. Nevertheless, those cases warrant our attention. In *Sheffield v. Eli Lilly & Co., supra,* 144 *Cal.App.*3d 583, 192 *Cal.Rptr.* 870, plaintiff's claim against the manufacturers of the Salk polio vaccine was summarily dismissed for failure to identify the defendant who had supplied the injury-causing vaccine. Plaintiffs appealed, urging the application of market-share liability.

The California Court of Appeals held that the rationale of *Sindell* was inapplicable for several reasons. First, the alleged defect related to the method in which the vaccine was processed (the "infectivity potential of the virus" had not been destroyed) and not to the design of the product, as was the case in *Sindell. Id.* at 594, 192 *Cal.Rptr.* at 876. The court explained:

Here, unlike *Sindell,* the injuries did not result from the use of a drug generally defective when used for the purpose it was marketed, but because some manufacturer made and distributed a defective product. The product that allegedly injured plaintiffs was itself not a unit of a total generic pharmaceutical product but a deviant defective vaccine. [Ibid.]

The court reasoned that it would be unfair to hold four innocent manufacturers responsible for an injury caused by the one tortfeasor who manufactured the defective dosage. *Id.* at 599, 192 *Cal.Rptr.* at 880; *cf. Brown v. Superior Court of California,* 44 *Cal.*3d 1049, 245 *Cal.Rptr.* 412, 751 P.2d 470 (1988) (holding that market-share theory of liability was inapplicable to fraud and breach-of-warranty claims).

The second reason why *Sindell* was inapplicable to the polio-vaccine context of *Sheffield* was that the "delay in discovering the alleged causation was in no way related to the nature of the defective product or any other act or omission of the unknown tortfeasor," again unlike *Sindell,* where the "delay was occasioned because the potential for harm was latent and did not manifest itself for many years." *Id.* 144 *Cal.App.*3d at 594, 192 *Cal.Rptr.* at 877.

Finally, the *Sheffield* court was of the view that an application of *Sindell* to the facts of the case would subvert the important public policy of encouraging swift production and marketing of new pharmaceutical products. *Id.* at 597–98, 192 *Cal.Rptr.* at 878–79. Specifically, the court noted that if market-share liability had been generally prevalent during the development of the poliomyelitis vaccine, manufacturers would have been reluctant to proceed. with the distribution of the vaccine, and consequently thousands of polio sufferers would not have been saved by the Salk vaccine program. *Id.* at 599, 192 *Cal.Rptr.* at 880.

If *Sheffield* clarifies the question of whether market-share liability is applicable to vaccines that are defective because of manufacturing flaws, then the decision in *Morris v. Parke, Davis & Co.*, 667 *F.Supp.* 1332, (C.D.Cal.1987) beclouds it. In *Morris*, a federal district court in California reasoned that *Sheffield*'s prohibition against the application of market-share liability was limited to only one type of manufacturing defect: that involving one unit that deviates from ostensibly identical units. *Id.* at 1341. *Sheffield* was inapplicable, according to the *Morris* court, to manufacturing defects shared by an industry "resulting from common (perhaps for reasons of economy) substandard means of production, storage and transportation or marketing." *Id.* at 1342. The court then went on to impose market-share liability on the manufacturers of DPT vaccines insofar as their vaccines contained this second type of manufacturing defect.

The court in *Morris* therefore focused only on the first point made in *Sheffield:* that market share liability was inappropriate for a manufacturing defect case. As a consequence, the court managed to elude the other two grounds on which *Sheffield* was premised: the fact that the delay in discovering the defect was unrelated to the nature of DPT, and the important public policy considerations attendant on expanding liability to needed pharmaceutical products. *See Sheffield v. Eli Lilly & Co., supra,* 144 *Cal.App.*3d at 594, 192 *Cal.Rptr.* at 876–77.

Moreover, we are not convinced that the *Morris* court was correct in classifying the defect as stemming from the manufacturing process. *See Cepeda v. Cumberland Eng'g Co., Inc.,* 76 *N.J.* 152, 169 (1978) (pointing up the distinction between manufacturing defects and defects of design). Although the court in *Morris* later stated that it was "irrelevant * * * whether the defect which caused the plaintiff's injuries is common to the products of all the defendant manufacturers because it was a design defect or because it was a manufacturing defect [shared by an industry]," 667 *F.Supp.* at 1342, that statement is at odds with the court's earlier pronouncement that plaintiff's design-

defect claims had been dismissed on grounds that comment k of the *Restatement (Second) of Torts* § 402A was applicable. *Id.* at 1334 n. 1. As such, the analysis in *Morris* lacks persuasive force.

We digress from a general overview of collective-liability precedent briefly to examine New Jersey case law. With the exception of the Appellate Division lead opinion in this case, there is no New Jersey decision that has expressly adopted concert of action, alternative liability, or market-share liability in the context of a products-liability action. Although in *Ferrigno v. Eli Lilly & Co.*, 175 *N.J.Super.* 551 (Law Div.1980), a trial court held that alternative liability based on a percentage-share apportionment was permissible in DES cases, the complaint was subsequently dismissed following the Appellate Division's opinion in *Namm v. Charles E. Frosst & Co., supra,* 178 *N.J.Super.* 19, which refused to adopt a theory of collective liability in a DES action.

The parties to this appeal appear to accept the proposition that this Court impliedly adopted a theory of alternative liability in *NOPCO Chemical Div. v. Blaw-Knox Co.*, 59 *N.J.* 274 (1971), and *Anderson v. Somberg*, 67 *N.J.* 291, *cert.* den., 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L.Ed.*2d 258 (1975), by allowing recovery without proof of a precise causative agent. In *NOPCO, supra,* 59 *N.J.* 274 a transportation-bailment case, a commercial drying machine was delivered in damaged condition to plaintiff's place of business, and plaintiff sued the manufacturer, the carriers, and bailees "who *successively,* but unconnectedly, handled [the machine] until it reached its final destination." *Id.* at 278 (emphasis added). However, because of the complex nature of the transportation and bailment chain, plaintiff was unable to establish which defendant was handling the machine when it was damaged. The absence of "identification" evidence resulted in dismissal of plaintiff's case at trial. That ruling was affirmed by a divided Appellate Division panel. This Court reversed, holding that plaintiff could make out a *prima facie* case by proving "the nature of the damage, the

identity of the respective defendants who handled [the machine], and the general capacities in which they did so." *Id.* at 284. Because the defendants separately owed plaintiff a duty of care and had superior knowledge of the occurrence, this Court concluded that it was appropriate to impose on the defendants the burden of going forward with evidence demonstrating their "particular part in the overall transaction in explanation or exoneration of [their] conduct with relation to the damage." *Ibid.* Plaintiff retained the ultimate burden of persuasion in respect of each defendant.

A situation somewhat analogous to *NOPCO* was presented in *Anderson v. Somberg, supra,* 67 *N.J.* 291, in which plaintiff, during the course of his surgery, was injured by a defective medical instrument but was unable to establish, as among the hospital, the doctor, and the instrument's manufacturer or distributor, exactly where culpability should lie. A plurality of this Court devised a sharply limited exception to the traditional rule that plaintiff carry the entire burden of proof in establishing liability. The exception provided that

> where an unconscious or helpless patient suffers an admitted mishap not reasonably foreseeable and unrelated to the scope of the surgery (such as cases where foreign objects are left in the body of the patient), those who had custody of the patient, and who owed him a duty of care as to medical treatment, or not to furnish a defective instrument for use in such treatment can be called to account for their default. They must prove their nonculpability, or else risk liability for the injuries suffered. [Id. at 298.]

Unlike the approach taken in *NOPCO*, the plurality shifted to defendants not merely the burden of going forward with explanatory evidence but also the burden of persuasion on the liability question, ruling that the Appellate Division had correctly determined that "since at least one of the defendants could not sustain his burden of proof, at least one of them would be liable." *Ibid.* That approach, which could conceivably be characterized as one of "alternative liability," has not been duplicated in any New Jersey case since *Anderson.* It is limited to one factual context.

Although the plurality opinion in *Anderson* relaxed the burden of persuasion in respect of the element of causation, it did not eliminate the requirement that some "reasonable connection" be established between the defendant and the ultimate harm. *Prosser & Keeton, supra,* § 41 at 263; *see, e.g., Thompson v. Johns–Manville Corp., supra,* 714 *F.*2d at 583. Significantly, plaintiff in *Anderson* sued all who might have been liable for his injury, as defined by all those who participated in the chain of events leading up to the injury. 67 *N.J.* at 304; *see NOPCO, supra,* 59 *N.J.* 274. Indeed, one of the justifications for shifting the burden of persuasion was that the defendants had engaged in conduct that "activated legal obligations by *each* of them to plaintiff." *Anderson, supra,* 67 *N.J.* at 298 (emphasis added). In sum, the decision in *Anderson,* even were it construed to apply outside of its factual context, does not support the adoption of market-share liability, which would eliminate the requirement of proof of any connection between defendant and the actual injury. Hence, there is no trend in this jurisdiction toward wholesale adoption of market-share liability.

### III

With the foregoing in mind, we proceed to the question of whether New Jersey should expand current principles of tort law to adopt risk-modified market-share liability in the DPT context. Preliminarily, we must address the issue of whether DPT is a "generic product" that is uniformly harmful and therefore amenable to a market-share analysis. However, the central consideration on which our decision is essentially premised is whether as a matter of sound public policy this Court should modify traditional tort theory to allow plaintiffs' design-defect claims to proceed. In examining this second question, we look to the general policies that formed the basis of the *Sindell* decision as well as the specific policy considerations that would accompany an expansion of tort law in the context of vaccines.

A determination of whether DPT is "uniformly harmful" must rest on a full understanding of the product involved in this appeal. DPT is a biological product made from three separate components: diphtheria toxoid, tetanus toxoid, and pertussis vaccine, each of which stimulates the production of antibodies that protect the body against those childhood diseases. Two major kinds of preparations used to produce immunity are the toxoid type (diphtheria and tetanus), and the whole-cell type (pertussis). Toxoid preparations contain small amounts of the toxins produced by certain bacteria, chemically treated to stimulate immunity without causing disease symptoms. The diphtheria and tetanus portions of the DPT vaccine are therefore not the source of any harmful side-effects. Instead, it is the pertussis portion of the DPT vaccine, made from a whole-cell type of preparation, that harbors the alleged defect.

Apparently because of the complex nature of the pertussis organism, the poisonous substances produced by the bacteria have been difficult to isolate. Consequently, the vaccine that was developed, still in use today, is made from a whole-cell type of vaccine preparation in which whole cells have simply been isolated and inactivated. This type of vaccine preparation is cruder than the toxoid-type preparation, and has been accompanied by adverse reactions varying from local to systemic. The injury alleged in this case—acute encephalopathy—represents a severe injury that is estimated to occur once in every 110,000 doses of the vaccine. *Staff of the House Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce, 99th Cong., 2d Sess., Report on Childhood Immunizations* 25 (Comm. Print 1986) (hereinafter *Comm. Print*).

Two other methods of vaccinating against pertussis should be mentioned. The first alternative method, which was on the market under the trade name Tri–Solgen at the time of Deanna's inoculation, is a "split-cell" or "soluble" vaccine, in which cells of the pertussis have been split or fragmented by a chemical process. It is unclear whether that method removed

the poisonous substances from the organism, or what portions of the pertussis cell remained in the vaccine. However, according to one of the clinicians who conducted early tests on the product, Tri–Solgen produced a "high degree of antibody response and markedly lower incidence of systemic and local reactions." Weihl, "Extracted Pertussis Antigen," 106 *American Journal of Diseases of Children* 210–15 (1963).

According to plaintiffs, however, Tri–Solgen too was defectively designed inasmuch as the vaccine did not completely eradicate the dangerous toxins inherent in pertussis. Plaintiffs refer us to another method of pertussis vaccination, developed by the Japanese, in which all of the toxins have allegedly been eliminated. This "acellular" method of pertussis vaccination has been in widespread use in Japan since 1981 but is not licensed in the United States. Its overall safety and clinical efficacy have not been formally reported.

At the time of Deanna's inoculation, five DPT manufacturers were producing a whole-cell pertussis vaccine, whereas one, Eli Lilly, was producing a split-cell vaccine. The products were clearly not identical because Eli Lilly's Tri–Solgen engendered a lower risk of harm. Nevertheless, the Appellate Division lead opinion swept all producers into one market share, placing the burden on Eli Lilly to prove that its product was less dangerous. Although we reserve decision on the general appropriateness of including products with differing degrees of risk in a market-share analysis, we are wary of the inclusion, in the lead opinion below, of Tri–Solgen inasmuch as the product may have represented the "state of the art" in vaccine design at the time of the inoculation. *See, e.g., N.J.S.A.* 2A:58C–3(a)(1) (providing that "state of the art" is an absolute defense in products-liability actions).

We are not persuaded, however, that the remaining whole-cell vaccines were also inappropriate for market-share analysis solely because they were made from a biological, as opposed to a chemical, formula. Although the vaccines were separately

patented or carried separate trade names, there is sufficient evidence that pediatricians used the whole-cell products interchangeably. One notable study, conducted on vaccines produced by Wyeth, Connaught, Lederle, and Parke–Davis, concluded that there was no significant difference in the rates of more serious reactions by vaccine manufacturers. Baraff, Cody, Cherry, "DPT–Associated Reactions: An Analysis by Injection Site, Manufacturers, Prior Reactions and Dose," 73 *Pediatrics* 31 (Jan. 1984). Indeed, any differences that were observed were for less-serious reactions and appeared to be related to differences in vaccine lots rather than in the specific vaccines. *Ibid.*

We turn, then, from the arguments that have been premised on technical distinctions between DES and DPT to the thrust of this appeal: the public-policy and public-health considerations that would accompany the imposition of market-share liability in this context.

## IV

This Court has adopted the basic tenet that "[t]he torts process, like the law itself, is a human institution designed to accomplish certain social objectives." *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 254 (1985). One of the primary objectives is to ensure "that innocent victims have avenues of legal redress, absent a contrary, overriding public policy." *Id.* at 254–55. Thus, implicit in any decision to broaden liability in order to provide compensation is a judgment that the goals of public policy will likewise be served. *See, e.g., Kelly v. Gwinnell*, 96 *N.J.* 538, 545 (1984) (imposition of social-host liability is consistent with overall social goal of reducing drunken driving); *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358 (1960) ("society's interests can only be protected by eliminating the requirement of privity between the maker and his dealers and the reasonably expected ultimate consumer"). In this case, however, we are presented with a difficult circum-

stance in which societal goals, in encouraging the use and development of needed drugs, would be thwarted by the imposition of unlimited liability on manufacturers in order to provide compensation to those injured by their products.

We deem it a matter of paramount importance that this case involves a vaccine—a product regarded as essential to the public welfare. Before the vaccine's appearance, the disease pertussis claimed the lives of thousands of children in the United States each year and left many others with severe injuries, including spastic paralysis, mental retardation, and other neurological disorders. *Comm. Print, supra,* at 9. In one epidemic alone, pertussis was responsible for as many as 7,518 deaths, afflicting a total of 265,269 children. *Id.* at 10. As a result of national immunization efforts sponsored by the federal government and begun in the early 1950s after the development of the vaccine, the country showed a ninety-nine percent reduction in the number of reported cases per 100,000 population during the years 1943 to 1976, and an even more dramatic reduction in the number of deaths. Hinman and Koplan, "Pertussis and Pertussis Vaccine: Reanalysis of Benefits, Risks and Costs," 251 *J.A.M.A.* 3109–13 (1984). Indeed, Congress has noted that the

[v]accination of children against deadly disabling, but preventable[,] infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken. [H.R.Rep. No. 908, 99th Cong., 2d Sess, 4, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6345.]

Those efforts notwithstanding, pertussis, not having been entirely eradicated, continues to pose a threat to the health of this country's children. Cherry, "The Epidemiology of Pertussis and Pertussis Immunization in the United Kingdom and the United States: A Comparative Study," 14:2 *Current Problems in Pediatrics* 67 (February 1984). Where there has been a reduced level of pertussis immunization, such as in Great Britain and Japan, major epidemics of the disease have recurred. *Id.* at 69. Hence, the federal government continues actively to finance and monitor immunization efforts through

the National Institutes of Health, the Food and Drug Administration, and the Center for Disease Control. New Jersey has assisted in this effort, as have the majority of states, by mandating that all school children be immunized before beginning their elementary-school education. *N.J.A.C.* 8:57–4:10. Nevertheless, a recent study from the Children's Defense Fund indicates that DPT immunization rates have fallen sharply since 1980, particularly among non-white infants. CDF, *The Health of America's Children* xi, 62–64 (1989).

Recent trends in the production and distribution of DPT have threatened the supply of the vaccine, with a predictable effect on the nation's immunization efforts.

> These trends include rapidly increasing prices for vaccines, a decline in the number of organizations involved in the production and distribution of vaccines which in turn may lead to interruptions in the supply of vaccines, and an increasing number of product liability lawsuits against vaccine manufacturers which allege injuries due to vaccines. [*Comm. Print, supra,* at 59.]

There are now only two commercial entities willing to produce the DPT vaccine, *id.* at 68, as contrasted with five in 1984. The overwhelming reason for the decrease in the number of manufacturers is the "extreme liability exposure, [the] cost of litigation and the difficulty of continuing to obtain adequate insurance." *Vaccine Injury Compensation: Hearing Before Subcomm. on Health and the Environment of the House Comm. on Energy and Commerce,* 98th Cong., 2d Sess. 295 (Sept. 10 1984) (Statement of Daniel Shaw, Jr., Vice–President for Medical Affairs, Wyeth Laboratories). As a consequence of this withdrawal phenomenon, the remaining firms must concentrate their efforts on expanding production to meet the nation's supply needs as opposed to focusing on research and development. *Comm. Print, supra,* at 67–70. The market's fragility has been reflected in the exorbitant increase in price of the DPT vaccine from eleven cents a dose in 1984 to $11.40 a dose in 1986 (eight dollars of which goes to insurance costs). *Brown v. Superior Court, supra,* 44 *Cal.*3d at 1064–65, 245 *Cal.Rptr.* at 421, 751 *P.*2d at 479.

In addition to the policy of ensuring the continued use of this essential drug is the more immediate need to develop a safer alternative vaccine. The creation of an alternative-vaccine design is a slow and complex process that demands the consolidated efforts of scientists, researchers, government agencies, and manufacturers. More importantly, it involves significant expense, shouldered almost entirely by vaccine manufacturers. *Comm. Print, supra,* at 89. Although research is already underway on an acellular vaccine, similar to that developed in Japan, *id.* at 38, it is estimated that research will be costly; a dose of the vaccine will cost approximately ten times more than the vaccine currently produced by the whole-cell method. *Ibid;* Anderson, "The Problems Associated With a Development in Clinical Testing of an Improved Pertussis Vaccine," 20 *Adv. App. Microbio.* 43, 52 (1976), cited in Burke, "DPT Vaccine Controversy: An Assessment of the Liabilities of Manufacturers and Administering Physicians Under Several Legal Theories," 17 *Seton Hall L. Rev.* 541, 548 (1987).

It is against this backdrop that we are asked to expand the scope of liability to which vaccine manufacturers may be held, irrespective of whether they actually produced the injury-causing product. We are told that this expansion represents the "trend" in modern tort law—an assertion that fails to take into account that "[i]t is not, however, the trend, but the social policy underlying it, that should guide the development of the common law." *Frame v. Kothari,* 115 *N.J.* 638, 653, 560 *A.*2d 675, 683 (1989) (Wilentz, C.J., and Garibaldi, J., concurring) (citing B. Cardozo, *The Paradoxes of Legal Science (1928), reprinted in Selected Writings of Benjamin Nathan Cardozo* 251, 284 (M. Hall ed. 1947). It is apparent that DPT manufacturers would have difficulty sustaining the increased cost attendant on the imposition of market-share liability while simultaneously covering ascending research costs in order to halt the unfortunate sequence of events that spawned this appeal, as well as continuing to meet current production needs. So much is clear from the extensive Congressional research on this

subject, *see Hearings, supra,* at 1–350 (Sept. 19, 1984, & Dec. 19, 1984); *Comm. Print., supra,* at 1–103, which has spawned the development of a new system of vaccine-injury compensation, National Childhood Vaccine Injury Act of 1986, 42 *U.S.C.A.* §§ 300aa–1 to –34 (West Supp.1988) (the Act). Of broader concern is the effect of market-share liability on the development of other experimental drugs, such as a vaccine against the spread of acquired-immune-deficiency syndrome (AIDS). *See* McKenna, "The Impact of Product Liability Law on the Development of a Vaccine Against the AIDS Virus," 55 *U. Chi. L. Rev.* 943 n. 4 (1988).

The overriding public policy of encouraging the development of necessary drugs is not unfamiliar to products-liability law. It is encompassed within comment k of the *Restatement (Second) of Torts* 402A, which provides that the producers of unavoidably unsafe products (products, including vaccines, that in the current state of human knowledge are incapable of being made safe for their intended and ordinary use) are not strictly liable for the unfortunate consequences attending their use. To merit that protection the product must be properly prepared and accompanied by proper directions and warnings. The exemption is premised on the ground that it would be "against the public interest" to apply strict liability to unavoidably dangerous products because of "the very serious tendency to stifle medical research and testing." *White v. Wyeth Laboratories,* 40 Ohio St.3d 390, 533 *N.E.*2d 748 (1988); *see Brown v. Superior Court, supra,* 44 *Cal.*3d at 1058, 245 *Cal.Rptr.* at 416, 751 *P.*2d at 479. The policies underlying the exemption are supportive of today's decision. *See Payton v. Abbott Laboratories,* 386 *Mass.* 540, 562–563, 437 *N.E.*2d 171, 184 (1982) (rejecting application of "market share" theory inasmuch as "[p]ublic policy favors the development and marketing of new and more efficacious drugs.").

Mindful of the desirability of providing compensatory relief to vaccine-injured persons, we look to the recent comprehensive efforts of Congress. After extensive research and hearings on

the subject of the unique problems presented by childhood vaccine injuries, *see, e.g., Hearings, supra; Comm. Print supra,* Congress devised a no-fault compensation scheme, entitled the National Childhood Vaccine Injury Act of 1986, 42 *U.S.C.A.* §§ 300aa–1 to –34, "under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H. Rep. No. 908, 99th Cong., 2d Sess., at 3 (1986), *reprinted in* "1986 U.S.Code Cong. & Admin.News" 6344 [hereinafter *House Report*]. *See generally* 38 L. Frumer & M. Freedman, *Products Liability* § 51.02 (1988) (providing extensive analysis of the Act); Schwartz & Mahshigian, "National Childhood Vaccine Injury Act of 1986: An Ad Hoc Remedy or a Window for the Future?" 48 *Ohio St.L.J.* 367 (1987) (examining vaccine-liability crisis and the Act's remedies); Note, "The National Childhood Vaccine Injury Act of 1986: A Solution to the Vaccine Liability Crisis?" 63 *Wash. L. Rev.* 149 (1988) (addressing the "role of the tort system in the vaccine liability crisis" and the probable success of the Act in resolving that crisis).

The Act provides that a person who has suffered illness, injury, or death need only submit a petition to the United States Claims Court alleging that the injury is vaccine-related. A presumption of vaccine-relatedness arises when the injury suffered is listed in the Vaccine Injury Table, contained in 42 *U.S.C.A.* § 300aa–14, and when the first symptoms of the injury occurred within the time period set forth in the Table. A special master then reviews the claim and the evidence, and prepares findings of fact and conclusions of law on whether compensation is appropriate, and, if so, the amount of the award. 42 *U.S.C.A.* § 300aa–12(c).

For those injured by a vaccine administered before October 1, 1988, the award is to represent "actual unreimbursable expenses" incurred from the date of the judgment awarding such expenses, and "reasonable projected unreimbursable expenses" including rehabilitation costs and costs incurred for custodial care. 42 *U.S.C.A.* § 300aa–15(a)(1)(A) & (c). The only signifi-

cant limitation is that the amount for pain and suffering, lost earnings, and attorneys fees may not exceed $30,000. 42 *U.S.C.A.* § 300aa–15(b). If the petitioner filed a civil action before the effective date of the compensation program and chose to withdraw from the action in order to file a petition, however, the Court of Claims may award costs and expenses incurred in the civil action, including the reasonable value of the attorney's time if suit was filed under a contingent-fee arrangement. 42 *U.S.C.A.* § 300aa–15(e)(2).

The Act is funded by a "Manufacturers Excise Tax on Childhood Vaccines." *House Report* at 34, *reprinted in* "1986 U.S.Code Cong. & Admin. News" 6375. The tax is "set to generate sufficient annual income for the [National Vaccine Injury Compensation Trust] Fund to cover all costs of compensation * * *." *Ibid.* To assure funding during the nascent stages of the Act, Congress has authorized and appropriated advances to the Fund. "Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Act," 1989, *Pub.L.* No. 100–436, 102 *Stat.* 1680 (1988). Specifically, for payments of claims associated with post-Act administrations of vaccines, Congress has appropriated, for fiscal year 1989 alone, "such sums as may be necessary"; for those claims associated with pre-Act administrations, Congress has appropriated "such sums as may be necessary, not to exceed eighty million dollars." *Ibid.* Therefore, as we understand it, Congress has appropriated, for pre-Act vaccine injuries, up to eighty million dollars for fiscal year 1989 as an advance or "front" money to the Fund, so that there will be funds on hand immediately for the payment of claims. Those dollars came from general revenues. The scheme contemplates that once the excise tax gets up to speed and generates enough money to keep the Act funded, the Fund will pay back, with interest, the amount it "borrowed" from the general revenues. We are therefore satisfied that the Act currently enjoys sufficient funding; moreover, it is clear that Congress has exercised the foresight to maintain that status in the future.

The goal of Congress was to afford a remedy for plaintiffs who would otherwise engage in protracted litigation against a vaccine manufacturer with the consequent risk of being denied recovery because of failure to prove the *prima facie* elements of a tort-law cause of action. The compensation scheme contained in the Act therefore does away with the traditional tort-law requirements of proof with respect to causation, injury, negligence, and defect. *House Report, supra,* at 12, *reprinted in* "1986 U.S.Code Cong. & Admin.News" at 6353. As the legislative history to the Act notes,

> [c]urrently, vaccine-injured persons can seek recovery for their damages only through the civil tort system or through a settlement arrangement with the vaccine manufacturer. Over time, neither approach has proven satisfactory. Lawsuits and settlement negotiations can take months and even years to complete. Transaction costs—including attorneys' fees and court payments—are high. And in the end, no recovery may be available. Yet futures have been destroyed and mounting expenses must be met. [*House Report, supra,* at 6, *reprinted in* "1986 U.S.Code Cong. & Admin.News" at 6347.]

Thus, by eliminating traditional elements of proof that often prove fatal to a tort-law claim, the compensation scheme contained in the Act went "beyond even the most [expansive] ruling issued by a court in a vaccine case." *Id.* at 26, *reprinted in* "1986 U.S.Code Cong. & Admin.News" at 6367. It could even be argued that in one sense the Act embodies a theory of collective liability, inasmuch as it does not require identification of a manufacturer; moreover, it allocates the cost of vaccine-related accidents among all manufacturers by imposing a tax on each dose of vaccine produced.

In addition to serving the goal of compensation, the Act was also intended to protect the unstable vaccine market by maintaining an adequate number of vaccine manufacturers. The legislative history observes that

> [t]he loss of any of the existing manufacturers of childhood vaccines at this time could create a genuine public health hazard in this country. Currently there [are] only * * * two manufacturers of the DPT vaccine * * *. [T]he withdrawal of even a single manufacturer would present the very real possibility of vaccine shortages, and, in turn, increasing numbers of unimmunized children, and perhaps, a resurgence of preventable diseases. [*Id.* at 7, *reprinted in* "1986 U.S.Code Cong. & Admin.News" at 6348.]

Consequently, the compensation scheme embodied in the Act is structured so that all victims who are injured after 1988 must first prosecute a claim under the Act before pursuing a separate cause of action under tort law. 42 *U.S.C.A.* § 300aa–11. Although victims injured before 1988 have the option of filing a claim under the Act, all victims regardless of the date of injury are precluded from receiving a subsequent award in a civil trial if they have agreed to accept a compensation award under the Act. In that way the compensation scheme is "intended to lessen the number of lawsuits against manufacturers." *Id.* at 12, *reprinted in* "1986 U.S.Code Cong. & Admin.News" at 6353.

In this case plaintiffs had the option of withdrawing their state tort-law claim without prejudice and filing a claim for compensation under the Act. The relevant section is 42 *U.S. C.A.* § 300aa–11(a)(5)(A), which provides:

A plaintiff who on the effective date of this subpart has pending a civil action for damages for a vaccine-related injury or death may, at any time within 2 years after the effective date of this subpart or before judgment, whichever occurs first, elect to withdraw such action without prejudice and file a petition under subsection (b) of this section for such injury and death.

*See, e.g., Foyle by McMillan v. Lederle Laboratories,* 674 *F.Supp.* 530, 533 (E.D.N.C.1987) (noting "withdrawal" provision of the Act). Given the expedient procedures for filing a claim under the Act and the near certainty of an award, as contrasted with the arduous process of convincing a state appeals court to dispense with the requirement of causation-in-fact, the first option would appear to have been plaintiffs' more prudent course of action. Indeed, under the Act, attorneys consulted about a vaccine-related injury are required to inform their clients of the availability of compensation under the Act. 42 *U.S.C.A.* § 300aa–10(b).

Instead of pursuing that remedy under the Act, however, plaintiffs have chosen the more hazardous and cumbersome route of attempting to reshape tort-law theory to encompass their claim. They remind us that if we affirm the order of summary judgment, and thereby disallow collective liability in

this instance, they will then be precluded from filing a claim under the Act. See 42 *U.S.C.A.* § 300aa–11(a)(5)(A) & (B). But that predicament, admittedly harsh, was a risk of which they were well aware and one that they willingly encountered. It therefore cannot form the basis of a determination by this Court to allow market-share liability or any modification thereof. The aim of the Act has always been to make vaccine liability more predictable by attracting claimants like these plaintiffs, whose legal position is tenuous, *before* they received a final determination by a court of law. No statutory purpose would be served if all potential claimants were permitted to cast the die first in a lawsuit and then turn to the Act in the event they were denied relief.

In sum, the existence of the Act is critical in this case for several reasons. First, it illustrates the complex nature of the problem underlying this appeal, which cannot be resolved simply by expanding tort-law theory. Second, it made available a means of compensatory relief for this plaintiff, which, although potentially smaller than a jury award might have been, was nonetheless certain. Finally, it satisfies the tort goal of encouraging safer products, inasmuch as the Act establishes a national program for the research and development of safer vaccines.

Not to be confused with this analysis is the separate question of whether the Act preempts state tort-law claims for design defect. *See Hurley v. Lederle Laboratories,* 851 *F.*2d 1536 (5th Cir.1988); *Abbot v. American Cyanamid,* 844 *F.*2d 1108 (4th Cir.1988); *Foyle by McMillan v. Lederle Laboratories, supra,* 674 *F.Supp.* at 533 (E.D.N.C.1987); *Martinkovic v. Wyeth Laboratories,* 669 *F.Supp.* 212 (N.D.Ill.1987); *Graham v. Wyeth Laboratories,* 666 *F.Supp.* 1483 (D.Kan.1987); *Patten v. Lederle Laboratories,* 655 *F.Supp.* 745 (D.Utah 1987); Note, "DPT Vaccine–Related Injury Actions: Federal Preemption Reconsidered," 41 *Rutgers L. Rev.* 373 (1988). The preemption issue appears to be well settled: the National Childhood Vaccine Injury Act does not expressly or impliedly preempt *tradi-*

*tional* state tort-law claims. *Hurley, supra,* 851 *F.*2d at 1539–40; *Abbot, supra,* 844 *F.*2d at 1112–13. (The Act does, however, limit state tort claims based on an injury arising after the effective date of compensation program to the extent that it codifies comment k of the *Restatement (Second) of Torts,* 42 *U.S.C.A.* § 300aa–22(b)(1), and creates a presumption that a vaccine's warning was valid if it complied with FDA requirements. 42 *U.S.C.A.* § 300aa–22(b)(2).) The fact that there is no preemption does not dissuade us from our result, because the issue in this case is not whether to allow a currently-viable claim to proceed, but whether to expand existing precedent in the face of a federal statute whose main goals—the development of an alternative approach to compensation and the protection of an unstable vaccine market—are in conflict with such an expansion.

In addition to the National Childhood Vaccine Injury Act, another piece of remedial legislation must be briefly acknowledged. The legislature recently passed a series of statutes, *N.J.S.A.* 2A:58C–1 to –7, in an effort to "establish clear rules" in respect of various product-liability issues, as well as clarify "specific matters as to which the decisions of the courts in New Jersey have created uncertainty." Senate Judiciary Committee Statement, No. 2805, *L.*1987, *c.* 197. Although there is no provision in those enactments governing the question of collective liability, they evince an intent to limit the expansion of products-liability law by creating absolute defenses and rebuttable presumptions of nonliability. *See N.J.S.A.* 2A:58C–3(a)(1) (adopting "state of the art" as complete defense in design defect claims); *N.J.S.A.* 2A:58C–3(a)(2) (providing that a product is not defectively designed if inherent characteristics of the product are known to ordinary person who uses it or consumes it with knowledge common to class of persons for whom product was intended); *N.J.S.A.* 2A:58C–3(a)(3) (adopting comment k of the *Restatement (Second) of Torts,* which provides that a manufacturer or seller is not liable for a design defect if harm results from unavoidably unsafe aspect and product is accompa-

nied by proper warning); *N.J.S.A.* 2A:58C–4 (establishing presumption of adequate warning if warning approved or prescribed by FDA). In this manner, the legislature sought to "balance[ ] the interests of the public and the individual with a view towards economic reality." *Shackil, supra,* 219 *N.J.Super.* at 543. We perceive our decision today as consistent with that goal.

## IV

Rather than approach our decision from the perspective of an analytical criticism of the market-share approach, we have chosen to posit today's ruling on the regressive effect that collective liability would have on the social policy of encouraging vaccine production and research. Our dissenting colleagues argue (1) that our analysis is not compatible with the procedural posture of this appeal, *post* at 213, (2) that our result is based on public-policy considerations more relevant to the issue of "duty" than of "causation," *post* at 192, 203, and (3) that our analysis has mistakenly applied considerations of the "unavoidably unsafe" nature of the product to the more general market-share question, *post* at 192. We address these points separately.

Plaintiffs' brief accompanying their motion for leave to appeal from the trial court's summary dismissal of their action alleges two errors: first, that there was a genuine issue of material fact regarding identification of a culpable defendant; second, "that defendants' motion for summary judgment should not have been granted because a concert of action, alternative liability, or enterprise theory of liability [was] applicable on the facts of the case." On appeal the lead opinion in the Appellate Division went right past the first issue—understandably, given that opinion's approach—and found that in respect of the second issue a "risk-modified market share" theory was applicable, thereby shifting proof of causation-in-fact to defendants. The applicability of market-share theory was subsequently briefed

and argued by all parties and *amici* in defendants' interlocutory appeal to this Court. There was no motion by plaintiffs seeking to have us address any other issue. It is therefore puzzling that the dissent should contend that "[i]t is terribly unfair to deprive this tragically disabled child of any remedy whatsoever for her catastrophic injuries on the basis of theories of law never presented to the Law Division * * *." *Post* at 213. In fact the court below treated the precise issue that plaintiffs raised—the applicability of collective liability to the circumstances of this case—and this Court has sought to give comprehensive treatment to the issues—*all* of the issues—raised here.

A separate procedural infraction perceived by the dissent is the premising of our decision on an insufficient factual record. *Post* 213–14. The dissent would have us remand this case to the trial court to permit plaintiffs to demonstrate "that the nature of this product and industry is such that market-share liability is an appropriate principle of causation to apply to the breaches of duty asserted." *Id.* at 213. Stated another way, our colleagues would allow a jury to determine the issue of an "unavoidably dangerous" design defect before the action could be dismissed on the basis of absence of proof of causation.

The difficulty with that approach is that it would place a fundamental public-policy decision, one to the analysis of which this Court is peculiarly well-suited, in a jury's hands to consider under the guise of an "unavoidably dangerous" design-defect analysis, which the dissent assumes embodies the same considerations as those that address the question of dispensing with the element of causation-in-fact. It clearly does not. The only commonality that exists between the current analysis and the "unavoidably dangerous" exception contained in comment k of the *Restatement (Second) of Torts* § 402A is that they are premised on the similar policy of encouraging the production of safe and efficacious drugs. Neither the language of comment

k nor its underlying spirit would support the dissent's maneuver of placing the cart before the horse by calling for a decision on the issue of defect before the issue of causation.

In addition, the dissent argues that our result is based on public-policy considerations "more relevant to the question of 'duty' than to the 'causation' question before us today." *Post* at 192. The contention is that "[w]hile causation questions are primarily concerned with the difficulty of proving, discovering, or even conceptualizing physical causal relationships, the tortious conduct question concerns even more profound notions of duty and moral responsibility." *Post* at 203. One need look no further than the early decisions in *Summers* and *Sindell*, which expanded principles of causation, to counter that assertion. In both cases, the underlying rationale was that as a matter of *general* policy, it was fairer to place the cost of injury on the negligent defendants than on an innocent plaintiff. *Sindell, supra* 26 *Cal.*3d at 610–11, 163 *Cal.Rptr.* at 144, 607 *P.*2d at 936; *Summers, supra,* 33 *Cal.*2d at 88, 199 *P.*2d at 3–4. An additional policy consideration was that the imposition of liability would provide an incentive to produce safer products. *Sindell, supra,* 26 *Cal.*3d at 610–11, 163 *Cal.Rptr.* at 144, 607 *P.*2d at 936. None of those justifications was based more on "causation," as opposed to "duty," principles; instead, the courts' focus was in furthering the general goals of tort law: morality, justice, fairness, and compensation to victims. An attempt to compartmentalize those goals into "causation" and "duty" issues is inventive but unconvincing.

Although we agree with the dissent's observation that New Jersey's approach to tort law "has been flexible to adapt traditional limitations on causation and recovery to the evolving needs of a complex society," *post* at 201, a more significant countervailing consideration informs today's decision: the imposition of market-share liability in this case would cut against the societal goals of maintaining an adequate supply of life-saving vaccines and of developing safer alternatives to current methods of vaccinations. Our aim is not to insulate vaccine

manufacturers from liability, but to acknowledge a painful reality—that the excessive exposure to liability that imposition of this novel theory would produce would inevitably discourage highly useful activity.

## V

The foregoing discussion should make clear that our opinion is confined solely to the context of vaccines. It should not be read as forecasting an inhospitable response to the theory of market-share liability in an appropriate context, perhaps one in which its application would be consistent with public policy and where no other remedy would be available. This case, the Court's first exposure to market-share liability, may therefore come to represent the exception rather than the rule.

Reversed. The judgment for defendant manufacturers is reinstated. No costs.

O'HERN, J., dissenting.

This is a case not so much about "market-share" liability as it is about the social utility of childhood vaccines that pose an infinitesimal but ever-present risk of catastrophic side effects. Like most parents, I had no idea of the potential side effects of the whooping-cough vaccine when it was administered to my own children. Knowing its possible consequences today, as an informed parent, I am certain that I would accept the risk as one in the best interests of the child. I have a sense that the product may be unavoidably unsafe. I would have no sense of outrage if, after weighing all of these risks, a child of mine suffered a severe side effect. Of course, I would welcome a no-fault remedy such as is found in the National Childhood Vaccine Injury Act, 42 *U.S.C.A.* §§ 300aa–1 to –34, but I might not expect the tort-liability system to compensate me or my child for the known potential of loss.

It is this intuitive feeling about the worth of the DPT vaccines, rather than a sense of injustice about the market-

share theory itself, that drives the Court to reject a "market-share" theory of liability in cases of multiple tortfeasors. Thus, I believe the Court has inverted its priorities. It has rejected the market-share theory by addressing the "unavoidably-unsafe" issue. While the latter defense may be valid in this case, it is not appropriate to resolve that issue on this summary judgment motion. The majority has decided the market-share question on policy grounds more relevant to the question of "duty" than to the "causation" question before us today. In doing so it has deprived the plaintiffs of the opportunity to investigate and present argument concerning the disputed policy question decided by the majority. In addition, by applying the "unavoidably-unsafe" policy questions to the more general market-share question the Court has precluded recovery even for failure-to-warn and negligence theories—a result not warranted even if one were to accept the majority's policy analysis. *See Brown v. Superior Court of California*, 44 *Cal.*3d 1049, 245 *Cal.Rptr.* 412, 751 *P.*2d 470 (1988) (holding prescription drug manufacturers not strictly liable for resulting injuries, but still subject to manufacturing defect, negligence, and failure-to-warn claims).

## I

### A.

What is market-share liability? And why do people say such bad things about it? At first glance, the doctrine appears to offend our notions of causation: How can you hold me responsible for something if you cannot prove I did it? Glenn O. Robinson, in his analysis of the issue, "Multiple Causation in Tort Law: Reflections on the DES Cases," 68 *Va.L.Rev.* 713 (1982), suggests that the doctrine is nothing more than a familiar application of tort law's way of dealing with multiple tortfeasors. When multiple tortfeasors have caused an injury, the plaintiff is ordinarily relieved of the burden of proving which of them has caused the injury. The usual example is the

case of two people who have set fires, either of which would have destroyed a farm field. Neither is excused from his or her conduct by saying "I caused you no injury. The other fire would have destroyed your farm anyway." *Restatement (Second) of Torts* § 432(2) & comment d, illustrations 3, 4 (1965). Another example is the concert-of-action theory. This liability theory holds defendants liable when, in pursuing a common scheme, any of them breaches a duty owed to a third person regardless of who causes the injury. *See Andreassen v. Esposito,* 90 *N.J.Super.* 170 (App.Div.1966) (participant in illegal drag race liable for injuries caused by other driver), *certif. denied,* 46 *N.J.* 605 (1966); *see* W. Prosser, *Law of Torts* 291–93 (4th ed. 1971); *Restatement (Second) of Torts* § 876 (1977) (adopting the concert-of-action theory).

"Alternative liability" imposes liability on two or more actors all of whom breached a duty of care but it is not clear which party's breach caused the injury. The most famous case involving alternative liability is *Summers v. Tice,* 33 *Cal.*2d 80, 199 *P.*2d 1 (1948). Because two hunters were both negligent in shooting in the plaintiff's direction, and it could not be proven which gun was the source of the plaintiff's eye and lip injuries, the court shifted the burden to each defendant to exculpate himself or be liable for the entire damages. *Id.* at 89, 199 *P.*2d at 5. If *Summers* is the classic statement of alternative liability, then the elements of the doctrine are: (1) plaintiff is unable to identify which defendant caused the injury; (2) all potentially liable injured parties are joined as defendants; (3) each defendant breached a duty of care owed to plaintiff; and (4) defendants are in a far better position to offer evidence of causation than plaintiff is.

The *Restatement (Second) of Torts* § 433B(3) (1965) has adopted the doctrine, saying:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Comment h to this subsection, often quoted by litigants' counsel, says, in relevant part, that although

[t]he cases thus far decided in which the rule * * * has been applied all have been cases in which all of the actors involved have been joined as defendants. * * * It is possible that cases may arise in which some modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant * * * or because of substantial differences in the character of the conduct of the actors or the risks which they have created.

*See* Annotation, "Liability of several persons guilty of acts one of which alone caused injury, in absence of showing as to whose act was the cause," 5 *A.L.R.*2d 98 (1949).

The *Summers* alternative-liability principles were applied to an industry to impose "enterprise liability" in *Hall v. E.I. Du Pont De Nemours & Co., Inc.,* 345 *F.Supp.* 353 (E.D.N.Y.1972). Thirteen children were injured in twelve unrelated accidents by unmarked blasting caps that the children found and detonated. Plaintiffs could not identify the particular manufacturers, so they sued "substantially the entire blasting cap industry and its trade association * * *." *Id.* at 386. That court permitted the plaintiffs to establish liability based on a variety of theories all recognizing that the development of "explicit or implicit safety standards, codes, and practices which are widely adhered to in an entire industry * * * could support a finding of joint control of risk and a shift of the burden of proving causation to the defendants" where individual defendant-manufacturers cannot be identified. *Id.* at 374.

In the touchstone case of "market-share" liability, *Sindell v. Abbott Laboratories,* 26 *Cal.*3d 588, 163 *Cal.Rptr.* 132, 607 *P.*2d 924, *cert. denied,* 449 *U.S.* 912, 101 *S.Ct.* 285, 286, 66 *L.Ed.*2d 140 (1980), the California Supreme Court rejected all three of the above theories of liability: (1) concert of action was unsupported by the facts of DES's development; (2) pure alternative liability was not allowed because not all of the possibly-responsible parties were in the suit; and (3) enterprise liability did not apply because (a) the DES industry was so large, (b) unlike in *Hall, supra,* 345 *F.Supp.* 353, there was no

allegation that the defendants had developed common safety standards through a trade association, and (c) adherence to industry standard was mandated, at least in part, by the government. *Id.* 26 *Cal.*3d at 601–610, 607 *P.*2d at 930–35, 163 *Cal.Rptr.* at 139–143.

The *Sindell* Court proposed a new theory. The policy reasons were clearly expressed:

> In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs. * * *
>
> The most persuasive reason for finding plaintiff states a cause of action is that advanced in *Summers:* as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury. [*Id.* at 610–611, 607 *P.*2d at 936, 163 *Cal.Rptr.* at 144.]

The *Sindell* doctrine is that "[i]f plaintiff joins in the action the manufacturers of a substantial share of the [product allegedly causing injury] which her mother might have taken, * * * the burden of proof [shifts] to defendants to demonstrate that they could not have made the substance which injured plaintiff * * *." *Id.* at 611, 607 *P.*2d at 937, 163 *Cal.Rptr.* at 145. The difference from alternative liability is that the plaintiff is not required to have before the court each and every manufacturer of the product. However, by the requirement of the substantial share of the market you increase the "likelihood that this comparative handful of producers manufactured the [product] which caused plaintiff's injuries." *Ibid,* 607 *P.*2d at 937, 163 *Cal.Rptr.* at 145.

As we know, the Wisconsin Supreme Court has mapped out a variant on these theories of liability in *Collins v. Eli Lilly Co.,* 116 *Wis.*2d 166, 342 *N.W.*2d 37, *cert. denied,* 469 *U.S.* 826, 105 *S.Ct.* 107, 83 *L.Ed.*2d 51 (1984). As in *Sindell,* the Wisconsin Court rejected the concert-of-action, alternative-, and enterprise-liability theories. The Wisconsin Court went on to recognize "the fundamental fairness of *Sindell's* shifting the burden of proof to the defendants," but concluded that the "unalloyed

market share theory does not constitute the most desirable course to follow in DES cases because the theory, while conceptually attractive, is limited in practical applicability." *Id.* at 188–189, 342 *N.W.*2d at 48. According to that court, "defining the market and apportioning market share [is] a near impossible task if it is to be done fairly and accurately," and "a second 'mini-trial' to determine market share" would be a "waste of judicial resources." *Id.* 188–192, 342 *N.W.*2d at 48–49. The court reasoned that each company "contributed to the risk of injury" even if all of them did not act in concert.

> We conclude that it is better to have drug companies or consumers share the cost of the injury than to place the burden solely on the innocent plaintiff. Finally, the cost of damages awards will act as an incentive for drug companies to test adequately the drugs they place on the market for general medical use. This incentive is especially important in the case of mass-marketed drugs because consumers and their physicians in most instances rely upon advice given by the supplier and the scientific community and, consequently, are virtually helpless to protect themselves from serious injuries caused by deleterious drugs. [*Id.* at 190–194, 342 *N.W.*2d at 49–50 (footnote omitted).]

Therefore, the Wisconsin Court ruled that plaintiff could proceed initially against one defendant and must prove the following: (1) the plaintiff's mother took the product; (2) the product caused the plaintiff's injury; (3) the defendant-producer marketed the type of product that claimant took, i.e., the color, shape, size, etc.; and (4) the manufacturer's conduct in producing the product constituted beach of duty to the plaintiff. *Id.* at 193–194, 342 *N.W.*2d at 50.

Plaintiff can recover all damages from the one defendant. *Ibid,* 342 *N.W.*2d at 50. Plaintiff may, of course, sue as many companies as may be possibly liable and the companies may implead others. *Id.* at 194–196, 342 *N.W.*2d at 51. Once the *prima facie* case is proven, the burden of proof shifts to the defendant to prove it did not produce or market the DES at the relevant time or in the relevant market. *Id.* at 197–198, 342 *N.W.*2d at 52. It is up to each to establish that its DES could not have reached plaintiff's mother. Assigning liability and apportioning damages is then done under the Wisconsin comparative-negligence statute. *Id.* at 197–199, 342 *N.W.*2d at 52–53.

In the final and the most significant case, a recent decision of the New York Court of Appeals adopted a form of market-share liability with the significant qualification that it would not excuse manufacturers who *could* show that their product did not injure the plaintiff. *Hymowitz v. Eli Lilly and Company*, 73 *N.Y.*2d 487, 541 *N.Y.S.*2d 941, 539 *N.E.*2d 1069 (1989).

[F]or essentially practical reasons, we adopt a market share theory using a national market. We are aware that that [sic] the adoption of a national market will likely result in a disproportion between the liability of individual manufacturers and the actual injuries each manufacturer caused in this state. * * * Thus our market share theory cannot be founded upon the belief that, over the run of cases, liability will approximate causation in this State * * *. Nor does the use of a national market provide a reasonable link between liability and the risk created by a defendant to a particular plaintiff * * *. Instead, we choose to apportion liability so as to correspond to the overall culpability of each defendant, measured by the amount of risk of injury each defendant created to the public at large. Use of a national market is a fair method, we believe, of apportioning defendants' liabilities according to their total culpability in marketing DES for use during pregnancy. Under the circumstances, this is an equitable way to provide plaintiffs with the relief they deserve, while also rationally distributing the responsibility for plaintiffs' injuries among defendants.

    \*      \*      \*      \*      \*      \*      \*      \*

Nevertheless, because liability here is based on the overall risk produced, and not causation in a single case, there should be no exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury. * * *

Finally, we hold that the liability of DES producers is several only, and should not be inflated when all participants in the market are not before the court in a particular case. We understand that, as a practical matter, this will prevent some plaintiffs from recovering 100% of their damages. However, we eschewed exculpation to prevent the fortuitous avoidance of liability, and thus, equitably, we decline to unleash the same forces to increase a defendant's liability beyond its fair share of responsibility. [*Id.* 73 *N.Y.*2d at 512–513, 541 *N.Y.S.*2d at 950, 539 *N.E.*2d at 1078 (citations and footnote omitted).]

Although perhaps the most controversial of the market-share decisions, its holding results in the scheme that is most similar to the almost universally-praised federal Vaccine Act.

As noted, Professor Robinson conceives of such alternative liability rules, and especially the *Sindell* rule, as being variants on the *Summers* principle. *See* Robinson, *supra*, 68 *Va. L. Rev.* 713. He notes, however, that because in *Summers* there

was a one in two probability that either defendant was responsible for the shot that injured the plaintiff, the result is much more acceptable from an intuitive basis. *Id.* at 724. In contrast, in the DES cases the odds on any given producer "could be less than 1 in 300." *Ibid.* If, for example,

> 90% of the market is divided equally, under the *Summers* rule of joint and several liability each of the manufacturers risks 100% liability based on a 15% probability that it caused the injury. * * *
>
> In recognition of this disparity, the *Sindell* case adopted a rule that reduces the disproportion between potential liability and the probability that a defendant caused the injury by imposing liability on producers only according to their respective market shares in the sale of DES. [*Id.* at 725.]

The *Sindell* court also imposed a requirement that a "substantial share" of the market be joined, but Robinson finds this aspect unpersuasive and inconsistent with the opinion's underlying logic. *See id.* at 725–26.

With these qualifications, Robinson notes that

> [i]n fact, the departure from traditional doctrine is not so large as may appear. * * * *Sindell* itself is essentially an application of *Summers v. Tice*, modified to include a rule of contribution. To be sure, the application of *Summers* to an entire industry, as distinguished from two hunters, stretches that precedent, at least as it has been construed heretofore. Yet it does no violence to the underlying principle of *Summers*, rationalized either in terms of shifting the burden of proof on causation or in terms of a substantive liability rule. Indeed, this application of *Summers* is conservative insofar as it incorporates a rule of contribution limiting each tortfeasor's liability commensurate with its particular contribution to the aggregate risk created by the product. [*Id.* at 768.]

## B.

Recognition of a market-share theory of liability would be entirely consistent with New Jersey's history and traditions. Judge Carton's provocative dissent in *Nopco Chem. Co. v. Blaw-Knox Co.*, 113 *N.J.Super.* 19, 24 (App.Div.), *rev'd*, 59 *N.J.* 274 (1971), foreshadows the growth of our law. There, one or more of multiple defendants handling a commercial product during its journey from the factory to the purchaser were responsible for its damaged condition. *Ibid.* Plaintiff could not prove which of the defendants had caused the damage.

Thus, all defendants argued that they were entitled to a dismissal of plaintiff's claims. *Ibid.* Judge Carton reasoned:

The law does not compel such a "lame and impotent conclusion." Reason and ordinary common sense dictate that * * * existing procedures be adapted or a new remedy be devised which will cause those parties most likely to possess knowledge of the occurrence to come forward with the facts peculiarly within their possession. To me it seems indefensible that the court should stand idly by and lend itself to such an obvious thwarting of justice. [*Ibid.*]

His dissent carried the day in the New Jersey Supreme Court, which held that "[w]e are firmly of the view that the complexity of the situation should not leave plaintiff remediless or require it to sue each defendant separately and successively at its peril simply because there is no precise precedent in this State." *Nopco Chem. Div. v. Blaw–Knox Co.*, 59 *N.J.* 274, 282 (1971).

So too, in *Anderson v. Somberg*, 67 *N.J.* 291 *cert. denied*, 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L.Ed.*2d 258 (1975), a multiple-defendant, surgical-injury case, this Court adopted a form of alternative liability. The *Anderson* plurality held that the plaintiff must recover from at least one of the defendants since no theory for the cause of the instrument's breaking in the plaintiff's spinal canal "was within reasonable contemplation save for the possible negligence of [the doctor] in using the instrument, or * * * [a] defect * * * attributable to a dereliction of duty by the manufacturer, the distributor, the hospital, or all of them." *Id.* at 296. A *Nopco*-like shift in the burden of production was insufficient. Rather, the burden of proof shifted as well. *Id.* at 300. Since at least one defendant must inevitably fail to meet the burden, a verdict must be returned for the plaintiff. *Ibid.* In concurring, Justice Jacobs voted to affirm on the basis of the Appellate Division majority opinion which held that the jury should have been instructed to return a verdict against at least one of the defendants because the contrary verdict represented a miscarriage of justice. *Id.* at 305. The dissent argued that the suit became "trial by lot, or by chance." *Id.* at 312.

But the *Anderson* judgment has stood the test of time. When one of multiple tortfeasors has most probably caused

plaintiff's injury, the law does not permit those tortfeasors to exonerate themselves by insisting that the plaintiff's inability to prove which of them caused the injury is a total bar in law to recovery.

In New Jersey, we have confronted several other situations in which causation is difficult, if not impossible, to prove within traditional standards, and have always rejected a complete bar to redress for wrongful conduct. As the majority has rightly noted:

The torts process, like the law itself, is a human institution designed to accomplish certain social objectives. One objective is to ensure that innocent victims have avenues of legal redress, absent a contrary, overriding public policy. * * *

* * * [W]e strive to ensure that the application of negligence doctrine advances the fundamental purpose of tort law and does not unnecessarily or arbitrarily foreclose redress based on formalisms or technicalisms. [*People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 *N.J.* 246, 254–55 (1985).]

Of course, causation-in-fact is far more than a technicalism. But the principle of causation is not an end of the legal system, but rather the means by which the legal system achieves its purposes. Thus, in *Evers v. Dollinger*, 95 *N.J.* 399 (1984), we recognized that under the circumstances, it would be impossible for the plaintiff to prove that if her physician had acted non-negligently, she would more likely than not have avoided the spread and recurrence of cancer. However, rather than insulate from liability tortious conduct that may have caused injury, we permitted recovery if the plaintiff could demonstrate within a reasonable degree of medical probability that if the physician had acted non-negligently, there was a substantial chance that her condition might have been avoided. We recognized the same standard in *Hake v. Manchester Township*, 98 *N.J.* 302 (1985), permitting recovery if the plaintiff could show that there was a substantial chance that the decedent could have survived if rescue had been attempted. We have also relieved plaintiffs of the burden of proving the causal connection between negligence and damages when a health-care pro-

vider has negligently contributed to a condition. *Fosgate v. Corona*, 66 *N.J.* 268, 272–73 (1974).

Our approach has been flexible to adapt traditional limitations on causation and recovery to the evolving needs of a complex society. In our recent decision in *Ayers v. Jackson Township*, 106 *N.J.* 557 (1987), we eliminated the requirement that a defendant be shown to have caused physical injury as a predicate to recovery. No party could prove that the defendant's tortious conduct had proximately caused the plaintiff's medical injury except for an unquantifiable enhanced risk of future disease. However, each party could prove exposure to risk-causing substance and the need for medical surveillance to permit early discovery and treatment of any disease that might develop. In the absence of proof of actual physical injury, we allowed a limited and modified recovery of damages. The opinion recognized the economic reality of risk of injury to human health, and imposed legal consequences.

In each of those cases we were confronted with parties who had breached a duty of care, a victim ostensibly injured as a result of that breach of duty, and a seemingly unprovable causal connection. Yet, rather than permit a whole class of tortious acts and injuries to be unremediable, we recognized a standard of causation appropriate to the circumstances.

In the case of generic drugs, marketed in such a manner as to make them essentially undistinguishable to the party bearing the risk of injury, market-share liability is just such an appropriate principle of liability. Professor Landes and Judge Posner, who advanced the theory that the role of the law is to foster the most economic advantages for society, suggested that "the idea of causation becomes a result rather than the premise of the economic analysis of accidents." Landes & Posner, "Tort Law as a Regulatory Regime for Catastrophic Personal Injuries," 13 *Journal of Legal Studies* 417 (1984). Within that context I believe that the proportionate market-share theory of liability poses the fairest solution to to the

problem. It is a resolution described by the *amici curiae*
Merck & Co., Inc., Abbott Laboratories, and The Upjohn Com-
pany as "the least unfair" of the non-identification liability
theories.

## II

### A.

The majority has not expressed any disagreement with the
conceptual underpinnings of market-share liability. *See ante* at
188. Rather, the majority states that "the thrust of this
appeal: [is] the public-policy and public-health considerations
that would accompany the imposition of market-share liability
in this context." *Ante* at 177. It thus appears that it has no
objection to the market-share concept of causation, but is solely,
and perhaps justifiably, concerned that the imposition of *any*
liability for this clearly beneficial vaccine will be detrimental to
society's interest in the availability of essential pharmaceutical
products. While this is undoubtedly a valid concern, even if it
properly related to the causation question before us today,
surely we have an insufficient record on which to decide the
question. Recall that the Law Division addressed one and only
one question: whether New Jersey would recognize alternative
liability for defective products under any state of facts. More-
over, the majority's premise does not necessitate its conclusion.
Put another way, it is obvious that none of the majority's
expressed concerns would be affected by a sudden discovery by
the parties of the actual manufacturer of the DPT dose in this
case. Thus, under the majority's ruling a manufacturer must
bear the same risks of liability that the majority seeks to
insulate the industry from, except to the extent that the compa-
ny can issue a product that would be for any reason difficult to
distinguish from that of other manufacturers.

The majority rejects the market-share theory of causation for
this product based on its perception that DPT is a beneficial
drug and that any liability will threaten its supply and the

efforts to develop a safer alternative. In New Jersey, we have been particularly candid to recognize proximate causation as an expression of legal policy. *See Brown v. United States Stove Co.*, 98 *N.J.* 155, 173 (1984); *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 77–78 (1966). Nevertheless, the "legal policy" has always addressed the concerns underlying the reasons for a "causation" limitation on liability, i.e., "whether conduct can be considered sufficiently causally connected to accidental harm so as to justify the imposition of liability * * *." *Brown, supra,* 98 *N.J.* at 173. Courts have had to conform the causation requirement to the needs of a changing society, recognizing that although the intentional battery may be the "classic" tort, such simple connections between conduct and result are increasingly less discernible.

The question of whether conduct should be considered tortious (here, whether a product should be considered safe) is also a policy question, but the policy issues are different from those presented for the causation issue. While causation questions are primarily concerned with the difficulty of proving, discovering, or even conceptualizing physical causal relationships, the tortious conduct question concerns even more profound notions of duty and moral responsibility. *See Kelly v. Gwinnell*, 96 *N.J.* 538 (1984). Traditionally, a finding of tortious conduct required a conclusion that the actor acted in some way that society has recognized as immoral or wrong. *See Brown v. Kendall*, 60 *Mass.* (6 *Cush.*) 292 (1850). Modern concepts of strict liability have departed from the culpability requirement in favor of more pragmatic concepts, *e.g., Michalko v. Cooke Color and Chem. Corp.*, 91 *N.J.* 386 (1982), but the notion that a person must have acted "badly" still pervades the doctrine. Thus a manufacturer will not be held responsible for injuries caused by a product unless the plaintiff can prove that the product was "defective." *O'Brien v. Muskin Corp.*, 94 *N.J.* 169, 179–80 (1983) ("The necessity of proving a defect in the product as part of the plaintiff's *prima facie* case distinguishes

strict from absolute liability, and thus prevents the manufacturer from also becoming the insurer of a product.").

In *Feldman v. Lederle Laboratories*, 97 *N.J.* 429 (1984), this Court was presented with the argument that all prescription drugs that are unsafe should be immunized from strict liability under comment k to section 402A of the *Restatement (Second) of Torts. Id.* at 441. Public policy, it was argued, demanded that prescription drugs be considered immune from strict liability because they were unavoidably unsafe. *Ibid.* We rejected such a wholesale argument:

[W]e see no reason to hold as a matter of law and policy that all prescription drugs that are unsafe are unavoidably so. Drugs, like any other products, may contain defects that could have been avoided by better manufacturing or design. Whether a drug is unavoidably unsafe should be decided on a case-by-case basis; we perceive no justification for giving all prescription drug manufacturers a blanket immunity from strict liability manufacturing and design defects claims under comment k.

Moreover, even if a prescription drug were unavoidably unsafe, the comment k immunity would not eliminate strict liability for failure to provide a proper warning. [*Id.* at 447.]

Plaintiffs in this case have asserted that safer DPT vaccines were available. They have also asserted, among other claims, that the warnings were inadequate and that the companies were negligent in their decision to market the whole-cell DPT virus. Under *Feldman*, these causes of action would be permitted to go forward even if the vaccine were unavoidably unsafe. Similarly, even the decision in *Brown v. Superior Court, supra*, 44 *Cal.*3d 1049, 1069–70 n. 12, 751 *P.*2d 470, 483 n. 12, 245 *Cal.Rptr.* 412, 424 n. 12, which rejected *Feldman's* case-by-case approach to the unavoidably-unsafe question and instead imposed a blanket unavoidably-unsafe immunity for all prescription drugs, would permit these other causes of action to proceed. Finally, although the federal Act prohibits recovery in civil actions for injuries from vaccines administered after the effective date of the Act, if the side-effect was unavoidable, it permits suits claiming a failure-to-warn and improper manufacture in appropriate circumstances. 42 *U.S.C.A.* § 300aa–22(b)(1). By contrast, this Court has applied the policy considerations

underlying the unavoidably-unsafe determination to impose a much more sweeping immunity.

The Court is quite explicit in limiting its rejection of market-share liability to contexts in which the relevant public policy considerations are present. Nevertheless, the decision gives no real guidance respecting its scope. Does it apply to all vaccines or just children's vaccines? Or is it applicable to all drugs that, in hindsight, we think are important? Perhaps it is applicable to all drugs that the drug manufacturer might have thought at the time distributed were important. Other courts refusing to impose strict liability on prescription-drug manufacturers have extended their holdings to drugs like DES, thalidomide, and even accutane. *See Brown, supra,* 44 *Cal.*3d at 1067–68, 751 *P.*2d at 481, 245 *Cal.Rptr.* at 422–423. Is this Court saying that the children who developed severe birth defects due to their mothers' ingestion of accutane to clear their complexion would also not be able to recover, lest the drug companies be hesitant to release new drugs? How are "important" drugs defined: complexion?, nausea?, fertility? Obviously we need not in every case define the holding applicable to other factual contexts, but if the purpose of our holding is for manufacturers to be encouraged to release important drugs, how can they find out in advance which ones *the Court* will consider important? They will always be operating at the risk the Court is trying to insulate them from. *See Brown, supra,* 44 *Cal.*3d at 1068–69, 751 *P.*2d at 482, 245 *Cal.Rptr.* at 423.

## B.

Perhaps the scope would be more discernible if the policy arguments themselves were more clear. For example, the majority refuses to impose any liability on DPT manufacturers because it feels that this result will encourage the development of safer drugs. Ordinarily the presumption is the opposite:

Imposing liability on defendants for their negligent conduct discourages others from similar tortious behavior, fosters safer products to aid our daily tasks, vindicates reasonable conduct that has regard for the safety of others, and,

> ultimately, shifts the risk of loss and associated costs of dangerous activities to those who should be and are best able to bear them. [*People Express, supra,* 100 *N.J.* at 255.]

*See also Michalko, supra,* 91 *N.J.* at 401 n. 4 ("imposing strict liability would induce providers of services to invest in safety, leading to greater protection for their customers and reduced accident costs."); *Beshada v. Johns–Manville Products Corp.,* 90 *N.J.* 191, 207 (1982) ("By imposing on manufacturers the costs of failure to discover hazards, we create an incentive for them to invest more actively in safety research.").[1] Although I might understand the temptation to avoid strict liability for beneficial drugs, *see, Brown, supra,* 44 *Cal.*3d at 1069–70 n. 12, 751 *P.*2d at 483 n. 12, 245 *Cal.Rptr.* at 424 n. 12, I do not see how this applies to a failure-to-warn or negligence claim where all that is called for is for the company to act reasonably. For the unavoidable procedural posture of this case, a procedural posture that the defendants have created, is that they have admitted that each manufactured and distributed a prescription drug that contains a common defect, that each failed to warn users of the dangers of the drug, that there are safer alternative designs for the drug, and, finally, that each acted negligently in the manufacture and marketing of the drug. This summary judgment action requires those admissions.

Furthermore, generally the logic that a manufacturer should not be held strictly liable for prescription drugs has been applied only where the drug could not be made safer. In *Feldman, supra,* we said: "[W]e see no reason to hold as a matter of law and policy that all prescription drugs that are unsafe are unavoidably so. Drugs, like any other products, may contain defects that could have been avoided by better

---

[1]Congress, as well, appears to have reached a conclusion contrary to that of the Court. *See* Schwartz & Mahshigian, "National Childhood Vaccine Injury Act of 1986: An Ad Hoc Remedy or a Window for the Future?," 48 *Ohio St.L.J.* 387, 395 (1987) ("Congress may have decided to retain the tort system for vaccine injury claims, at the expense of greater predictability, as a means of providing incentives for the manufacture of safe vaccines.").

manufacturing or design." 97 *N.J.* at 447. By contrast, in this case, the drug companies argued that the fact that there *was* a safer product should exempt them from liability since the market-share analysis would be too difficult. Although I could perhaps understand reducing, or even exempting, the safer product from its market share of liability, I cannot understand why we would insulate the companies making the less-safe products. Plaintiff asserts that some of the companies continued to manufacture, market, and try to outsell the ostensibly-safer vaccine, Tri–Solgen, even after they had concluded that Tri–Solgen was safer than their product.[2] I fail to see why any manufacturer should feel compelled to make a safer vaccine when in this case we find public policy to demand their exemption from liability even though the plaintiff alleges, and therefore we must assume, that the defendants knowingly continued to market and manufacture a product they knew to be less safe, and that they refused to inform physicians of the additional risk.

The majority's attempt to influence the future behavior of DPT manufacturers is misdirected insofar as the federal Act will most certainly be the sole motivating force for their actions. Under the federal Act, a party injured by a vaccine administered after October 1, 1988, the effective date of the Act, is effectively prohibited from filing a civil action until after his or her other claim under the Act has been adjudicated. 42 *U.S.C.A.* § 300aa–11(a)(2, 3). The party can file suit at that time

---

[2]Lederle's recently-released internal correspondence "stated that the test results demonstrated that Lederle's product had a significantly higher reaction rate than Lilly's non-cellular vaccine." Burke, "DPT Vaccine Controversy: An Assessment of the Liabilities of Manufacturers and Administering Physicians Under Several Legal Theories," 17 *Seton Hall L.Rev.* 541, 569 (1987). Further clinical evaluations were planned by Lederle, but they were never completed. Frankly, I rather suspect that these qualitative differences in the DPT vaccines would be winnowed out in the trial process. The reaction rate that we are talking about here is the catastrophic reaction rate, not those who suffer greater or lesser degrees of discomfort and distress. It is the catastrophic common defect that must be shown to be qualitatively different.

only if it waives any compensation awarded under the Act. 42 *U.S.C.A.* § 300aa–21. Given the recent State legislation cited by the majority, *ante* at 187–88, making such product-liability actions difficult to win, as well as the federal legislation precluding liability in civil actions for some claims arising from injuries caused by a vaccine administered after the effective date of the federal Act, 42 *U.S.C.A.* § 300aa–22, it is unlikely that many claimants will risk their award to pursue a civil action, and even more unlikely that anyone denied compensation under the federal Act will be able to succeed in a civil action. Thus, any fear of liability that may affect a manufacturer's decision to attempt to develop a safer product, or conversely to cease production, would be virtually unaffected by the majority's decision today. In addition, in an effort to assure continuing vaccine availability and development of safer vaccines, the Act devotes substantial resources to the coordination of public and private efforts towards developing safer vaccines and programs to administer them. 42 *U.S.C.A.* §§ 300aa–2, –3.

The final policy argument that needs to be examined is the extent to which liability expenses are the cause of the price increases. The problem appears very complex. One commentator has stated that "unlike some other products, the incidence of serious injury with children's vaccines is very low. Thus, a vaccine compensation system can be self-funding by adding a very small excise tax to the price of vaccines." Schwartz & Mahshigian, *supra*, 48 *Ohio St. L.J.* at 393 (footnote omitted). If injuries are so rare, perhaps the claim that price increases are due to liability costs should be more critically examined. However, even if one accepts the Court's "findings" that the price per dose increased in two years from 11¢ to $11.40, $8.00 for insurance, *ante* at 179, that still amounts to a twenty-sevenfold increase in non-insurance-related costs corresponding to the development of a market with only two suppliers. Moreover, since the liability exposure has been greatly reduced by the federal Act, presumably the insurance costs have reduced accordingly. Although the majority claims that its holding is

consistent with the federal Act, it is clear that Congress, which spent much more time and money examining the issue, decided that it would be inappropriate to deny compensation, recognizing that an appropriately-limited liability would not threaten the industry.

### III

This brings me to the most troublesome aspect of the majority's opinion: its adjudication of the available remedies under the federal act and willingness to fault the plaintiff for asserting her rights. In reading the majority opinion I get a sense that the Court feels that in pursuing a tort recovery the plaintiff is somehow seeking a windfall or something more than she deserved. Nevertheless, the federal Act specifically prohibits states from "establish[ing] or enforc[ing] a law which prohibits an individual from bringing a civil action against a vaccine manufacturer for damages for a vaccine-related injury or death if such civil action is not barred by this part." 42 U.S.C.A. § 300aa–22(e). Surely Congress did not intend state courts to accomplish the same effect by molding state common law to deny recovery in reliance on the general availability of a federal remedy.

In addition to the fact that the plaintiff should not be penalized for exercising her right under the federal act to pursue her tort remedy, at the time this suit was filed, the federal act had not yet been enacted. Therefore, plaintiff could not be sure whether she would be eligible to recover under it. Moreover, even now it is unclear whether any remedy plaintiff would be "entitled" to would actually be sufficiently funded. Finally, although the plaintiff is permitted to withdraw her State tort suit and pursue the federal remedy, she will not be allowed to do so if this case is dismissed. Before the Court limits tort recovery under New Jersey partially on the basis of an alternative remedy, we should be certain that such remedy is, in fact, both sufficient and available.

Defendants maintain that Deanna Marrero is eligible to receive compensation under the program.  Under the Act, vaccine injury victims are divided into three groups:

(a) those who both were injured by a vaccine administered before October 1, 1988, the effective date of the Act, *and* filed a civil suit prior to that date, 42 *U.S.C.A.* § 300aa–11(a)(4, 5);

(b) those injured by a vaccine administered before October 1, 1988, who had not filed a civil suit prior to that date. 42 *U.S.C.A.* § 300aa–11(a)(6);

(c) those injured by a vaccine administered after October 1, 1988.  42 *U.S.C.A.* § 300aa–11(a)(3).

Those in the first category, such as Deanna Marrero, may continue any pending lawsuit, but will become ineligible for compensation under the Act unless damages were denied or their suit dismissed with prejudice prior to October 1, 1988, 42 *U.S.C.A.* § 300aa–11(a)(4), or the plaintiff voluntarily withdraws the pending suit prior to October 1, 1990. 42 *U.S.C.A.* § 300aa–11(a)(5).  The second group may file a civil suit, but are then ineligible to file a claim under the Act. 42 *U.S.C.A.* § 300aa–11(a)(6).  The third group must complete the Act's compensation proceeding and reject its judgment before pursuing a civil claim. 42 *U.S.C.A.* § 300aa–11(a)(2, 3). No party may file a claim under the Act if damages have been awarded for a vaccine-related injury under a judgment or settlement of a civil action. 42 *U.S.C.A.* § 300aa–11(a)(7).

The Act also creates an affirmative defense of sorts.  In order to award compensation, the special master or the court must find that there is not a preponderance of the evidence that the injury was caused by factors unrelated to the administration of the vaccine. 42 *U.S.C.A.* § 300aa–13(a)(1)(B). The majority of courts reviewing both the provisions and legislative history of the Act have concluded that "Congress contemplated that civil tort remedies for vaccine-related injuries have been available, are now available, and will continue to be available under certain circumstances, even after the effective date of the Act." *Patten v. Lederle Laboratories,* 655 *F.Supp.* 745, 749 (D.Utah 1987).  Thus, we should not deny our State remedy due to the availability of a federal remedy when the Act creating that

federal remedy contemplates the continuing availability of State remedies.

Moreover, although this suit was filed on April 19, 1985, the Act was not passed until November 14, 1986. Thus no alternative federal remedy was available at the time the suit was filed. The Act is partially funded by a Vaccine Injury Compensation Trust Fund funded by an excise tax on vaccines. 26 U.S.C.A. 9510. Compensation for persons injured by vaccines administered *after* the effective date of the Act will be awarded from this Trust Fund. 42 U.S.C.A. § 300aa–15(i)(2). Compensation for persons injured by vaccines administered *before* the effective date of the Act, like Deanna Marrero, is made from appropriations. 42 U.S.C.A. § 300aa–15(i)(1).

Congress has authorized appropriations for this purpose of $80 million for this year and the same amount for each of the next three fiscal years, but these appropriations were not authorized until December 22, 1987, two and one-half years after this suit was filed. 42 U.S.C.A. § 300aa–15(j). Congress is currently considering additional appropriations measures to fund this aspect of the program. Nevertheless, there is a serious debate over whether such appropriations are or will be sufficient to give the statutory award to all persons injured prior to the Act. Furthermore, authorization of an appropriation is only one step in a long process before the money is actually appropriated. Many forces along the way can lead to reduction or elimination of the funding. The majority points to the one-time appropriation of $80 million out of the $320 million authorized as evidence of the certainty of funding. I am not so sure that the need for a B–2 bomber may not take precedence in other years over vaccine funding. The Act also places an overall cap of 3500 on the number of claims that can be filed for injuries due to vaccines administered prior to the Act. 42 U.S.C.A. § 300aa–11(b)(1)(B). In short, the remedy may or may not ever be there.

. Finally, this plaintiff will be ineligible for compensation under the Act if summary judgment is granted. The Act precludes the filing of a claim where the injured party has received damages pursuant to a settlement. 42 *U.S.C.A.* § 300aa–11(a)(7). Although plaintiff had settled her claim with her doctor, such settlement was withdrawn prior to court approval in recognition that such settlement would preclude a later claim under the Act. However, plaintiff will also be unable to file a claim unless she voluntarily withdraws her State court action by October 1, 1990, and prior to judgment. 42 *U.S.C.A.* § 300aa–11(a)(5). Therefore, by refusing to recognize market-share liability as a valid theory in this case, we are precluding plaintiff from withdrawing her suit prior to judgment and effectively extinguishing both her state and federal recovery. While such a result might be appropriate were we to conclude that market-share liability was somehow conceptually lacking, and therefore inappropriate in New Jersey, the result is wholly unfair under the majority's rationale. Although I believe that the Act represents a tremendous advance in the development of an effective reparation system for vaccine-related injuries, unfortunately under the majority's ruling the Act will not apply to the current cause of action.

From my perspective, the most critical and significant provision of the Act is that it creates the Vaccine Injury Compensation Trust Fund with money collected from an excise tax on vaccines. 26 *U.S.C.A.* § 9510. In other words, the industry as a whole shares the risk of financial compensation for injuries after October 1, 1988, attributable to individual manufacturers. *See* 42 *U.S.C.A.* § 300aa–15(i)(2). I think that we would do well to mold our tort law to this model. I agree that punitive damages are inappropriate in this setting of market-share responsibility and that proportional several liability is the fairest solution. We should be candid to recognize, in the face of the enormous medical, legal, and social ramifications of childhood-vaccine injuries, that the goal of the legal system should be to steer a course toward the result that will yield the greatest

benefits to human health. That principle involves a candid recognition of the limitations of tort liability to deal fully with the problem while at the same time seeking the maximum prevention of human disease and the maximum fairness in the alleviation of human suffering.

## IV

I am usually the last person ever to insist on strict adherence to the Civil Rules of Procedure. But there is something deeply flawed about the way this case has proceeded. It is terribly unfair to deprive this tragically disabled child of any remedy whatsoever for her catastrophic injuries on the basis of theories of law never presented to the Law Division and on the basis of an alternative federal remedy that was not in existence when her case was argued in the Law Division and not even funded when her case was argued in our Court.

I have no idea of the extent to which Deanna can understand these proceedings, but surely she would see the law as the cruelest of hoaxes: dismissing her state common-law claim because she had a federal remedy while with the same stroke of the pen extinguishing that federal remedy because she had elected to ask us if there was a state remedy for her catastrophic injuries. The most that we should do in this situation is to give a declaration of what a claimant's rights are, not to ask a twelve-year-old girl to play a game of blind man's bluff with our legal system.

I would hold that New Jersey should recognize market-share liability in an appropriate case. I see no reason why plaintiff should not be permitted to demonstrate that the nature of this product and industry is such that market-share liability is an appropriate principle of causation to apply to the breaches of duty asserted. Were we to reject "market-share" on this record, we would be out of step with both California and New York. If those two great states can mold their law to the needs of their citizens without dislocation of public markets, I fail to

see how the industry could not abide the needs of New Jersey's citizens. The policy questions surrounding the necessity of this drug will not be ignored, but will be addressed if the defendants raise the defense that the product is unavoidably unsafe.

I would remand the case, then, to the Law Division, as the Appellate Division did, to resolve whether DPT is an unavoidably unsafe product and, if not, whether there is a sufficiently common defect in the products marketed to invoke a *Sindell*-style market-share liability in New Jersey. This is no mean challenge. Deanna will face an enormous uphill struggle in asserting her claims. I have no doubt that we should abide by the recently-enacted guidance of our products-liability act, *N.J. S.A.* 2A:58C–4, that a failure-to-warn claim in the case of prescription drugs should be measured by compliance with the FDA's required warnings. Congress has enacted the same principle as one of national policy for all injuries due to vaccines administered after the effective date of the Act. 42 *U.S.C.A.* § 300aa–22(b)(2). And I genuinely doubt that she will be able to establish that there was indeed an equally effective and safer alternative vaccine.[3] The FDA has refused to re-license Tri-Solgen, and the so-called Japanese acellular vaccine is nowhere near availability for marketing. Finally, the proof of actual medical causation will remain as elusive as ever. *See Niemiera v. Schneider,* 114 *N.J.* 550 (1989) (plaintiff's injuries were assertedly attributable to causes other than DPT). By contrast, if she elects to withdraw her suit and is eligible under the federal Act, she will enjoy a presumption that the vaccine caused her injuries. *See* 42 *U.S.C.A.* § 300aa–13.

---

[3]The data overwhelmingly support the efficacy of DPT if administered with proper warnings. *See* S.Rep. No. 483, 99th Cong., 2d Sess. 3 (1986) (Morbidity and mortality have dramatically decreased due to child immunization programs, *e.g.,* in the case of DPT the number of cases decreased from 265,269 in 1934 to 2,000 in 1982, and the number of deaths declined from 7,500 in 1934 to 4 in 1982.)

Armed with foreknowledge of the legal principles that will be applied, her counsel can then exercise judgment on whether or not this vaccine can be proven not to be unavoidably unsafe within the meaning of our law and to contain a common defect such that the imposition of market-share liability is warranted. Under the federal Act her attorney is obligated to inform her that compensation may be available under the federal program. 42 *U.S.C.A.* § 300aa–10(b). Fully informed of her chances of recovery under both our State tort law and the federal Act, she might elect to seek, if eligible, the federal vaccine remedy. She deserves this chance.

I cannot play a shell game of remedies with a disabled child. No member of the Appellate Division genuinely believed that the New Jersey Supreme Court would not recognize a form of market-share liability. Each differed as to either the form of alternative liability or whether the decision could be made only by "either the Supreme Court or the Legislature." 219 *N.J.Super.* at 642. No judge or lawyer did predict or could have predicted that the New Jersey Supreme Court would find that market-share liability was indeed an acceptable principle of New Jersey tort law ("This case * * * may therefore come to represent the exception rather than the rule.") *Ante* at 191, but a principle that could not be invoked when there was an alternative federal remedy.

Deanna Marrero has suffered enough. She ought not to have had to guess under which hand of the law she might find some surcease of her suffering. She ought at least to have been given a chance to know the rules before she had to make the choice.

*For reversal*—Justices CLIFFORD, POLLOCK, GARIBALDI and STEIN—4.

*For affirmance*—Justices HANDLER and O'HERN—2.